# United States Court of Appeals
## For the First Circuit

No. 11-2186

PAUL J. CAMERON; PAUL T. FERRIS;
PAUL M. GLEASON; KENNETH W. ROSENTHAL,

Plaintiffs, Appellants,

KEVIN O'KEEFE,

Plaintiff.

v.

IDEARC MEDIA CORP.,

Defendant, Appellee,

LOCAL 1301 COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO;
GEORGE ALCOTT; ED RAAD; KIMBERLY DONAHUE;
TODD SANISLOW; HEWITT ASSOCIATES, INC.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Selya and Boudin, Circuit Judges.

Francis G. Gleason, Jr. with whom Gleason & Gleason was on brief for appellants.
Arthur G. Telegen with whom Jean M. Wilson and Seyfarth Shaw LLP were on brief for appellee.

July 13, 2012

**BOUDIN, <u>Circuit Judge</u>.** Appellants Paul J. Cameron, Paul T. Ferris, Paul M. Gleason, and Kenneth W. Rosenthal are former directory-advertising sales representatives in the Premise Sales unit of appellee Idearc Media Corporation ("Idearc"). Each was discharged in July 2007. Idearc says they were let go for poor performance; the employees allege that the terminations were motivated by age discrimination and a desire to negate pension benefits, and they also advance a retaliation claim. The district court rejected all of their claims.

The lawsuit revolves around Idearc's Minimum Standards Plan ("MSP") included in its 2002 collective bargaining agreement (the "2002 CBA") with Local 1301 of the Communications Workers of America ("the Union"). The 2002 CBA's terms governed the employment relationship between appellants and the company from June 2, 2002 to June 23, 2007. After the 2002 CBA expired, no CBA was in effect until December 7, 2008, when Idearc and the Union agreed to a new collective bargaining agreement (the "2008 CBA").

The 2002 CBA's MSP authorized Idearc to terminate under-performing employees as specified by the plan. Employees were divided into three "channels"--Premise Sales, Senior Telephone Sales, and Telephone Sales--which were subdivided into seven "peer groups."[1] Employees in each peer group were ranked within

_____

[1]The Premise Sales and Senior Telephone Sales channels were each divided into three peer groups that corresponded to geographic areas in New England. The Telephone Sales channel constituted one

-2-

six-month periods by "percent net gain"--which was calculated by comparing a salesperson's revenues against the revenue produced by his accounts in the previous year.  Until January 2005, the bottom 30th percentile of each peer group in any semester "failed" that semester unless the employee met an alternative company-set net gain objective.  2002 CBA, art. 43.02.

Idearc was permitted to terminate employees failing 4 out of 7 consecutive semesters--with the caveat that no more than 7.5 percent of a peer group could be terminated in any given semester. 2002 CBA, art. 43.03(d).  The CBA also provided for appeals of terminations under the MSP to a joint union/management Performance Plan Review Board.  Id. at art. 46.  In substance, the MSP aimed to cull those sales representatives who were weaker performers but only if they were regularly at the bottom of the tally and also below the company's net gain objective target.

The MSP was designed to identify 10-15 percent of employees for termination per year.  The 2002 CBA required Idearc and the Union to revise the "failing" percentile (originally 30 percent) in January 2005 and 2007--so as to better achieve the middle of the 10-15 percent target range--if the number of employees qualified for termination fell outside the 10-15 percent range.  2002 CBA, art. 43.06.  As of January 2005, only one employee had been terminated under the MSP.  Idearc then raised the

peer group.

"failing" figure to the 70th percentile and also lowered the alternative net gain objective target, making the latter figure much more important (but still subject to the 7.5 percent limit on terminations within a single peer group).[2]

Appellants in this case each qualified for termination under the MSP after failing the first semester of 2007 (as well as the necessary number of prior semesters) and were terminated in July 2007. Each plaintiff was over 40 years old at the time of termination, and each had between 18 and 28 years of service at Idearc. Rosenthal and Gleason were about two years away from qualifying for service pensions that respectively vested after 20 and 30 years of service; Ferris was about 4.5 years from his service pension; and Cameron was 7 years from his service pension and less than 2 years from his deferred vested pension.

Appellants brought the present lawsuit against Idearc in December 2008. Without denying that they had failed under the MSP, they alleged that they were fired not because of the MSP but because of their age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (2006), and in order to deprive them of pension benefits, in violation of the

_____

[2]Quantitative analysis indicated that even raising the "failing" percentile from 30 to 100, making all employees subject to the net gain objective requirements, would not achieve the aimed-for 10-15 percent target range; but, with the revision, those employees regularly in the top 30 percent remained immune to discharge under the plan even if they failed the now lowered objective net gain figure.

-4-

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. (2006). Appellants also allege Idearc later retaliated against them for filing this suit, also in violation of ERISA, 29 U.S.C. § 1140, by refusing to reinstate them as required by the 2008 CBA.[3]

On summary judgment, the district court assumed arguendo that appellants could establish a prima facie case for their discrimination theories. But, Idearc having proffered a performance-based explanation for the terminations, the court found that appellants had not provided evidence from which a reasonable jury could conclude that Idearc's reason was pretextual; neither was there sufficient evidence of retaliation for filing this suit. Accordingly, the court granted summary judgment to the defendants.

In the alternative, the district court considered appellants' claims barred by section 301 of the LMRA, primarily because the court found that the discrimination claims, if they went forward, depended on interpreting the CBA (thus arguably being subject to the CBA's dispute resolution provisions). Cf. Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 407 n.7 (1988).

---

[3]Appellants also brought state law claims against Idearc–for tortious interference with contract--that were grounded in alleged breaches of the CBA, and against the Union for breach of its duty of fair representation--what is known as a "hybrid" claim--under section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Other state law claims, including age discrimination, were also advanced. Only the federal ADEA, ERISA and retaliation claims are pressed on this appeal.

Because we affirm on the ground that appellants' claims failed to present a jury issue on the charges of discrimination or retaliation, the question of LMRA preemption need not be pursued.

The ADEA protects employees against, among other things, discriminatory discharge based on age. 29 U.S.C. § 623(a)(1). Absent direct evidence of discrimination--of which there is just about none here--ADEA claims are evaluated under the familiar burden-shifting standard of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 n.2 (1st Cir. 2009). A plaintiff must first establish a prima facie case, which is fairly easy to do, by showing

> --that he or she was at least 40 years old at the time of discharge;
>
> --that he or she was qualified for the position but was nevertheless fired; and
>
> --that the employer subsequently filled the position.

Id. at 447.

The employer must then produce a legitimate non-discriminatory reason for termination; and, if this is done, the plaintiff bears the ultimate burden of proving, by a preponderance of the evidence, that the defendant's proffered reasons were a pretext for discrimination. Vélez, 585 F.3d at 447-48. This brings the plaintiff back to having to prove his or her case but

with the added, often critical, advantage to the employee of having pinned down the defendant's purported justification.

Section 510 of ERISA prohibits <u>inter alia</u> discharge for the purpose of interfering with the attainment of rights under an employee benefit plan. 29 U.S.C. § 1140. Again the <u>McDonnell Douglas</u> framework is used when direct evidence of discrimination is lacking. <u>Kouvchinov</u> v. <u>Parametric Tech. Corp.</u>, 537 F.3d 62, 67 (1st Cir. 2008). A plaintiff must establish a prima facie case--that he was prospectively entitled to ERISA benefits, was qualified for his position, and was discharged "under circumstances that give rise to an inference of discrimination." <u>Lehman</u> v. <u>Prudential Ins. Co. of Am.</u>, 74 F.3d 323, 330 (1st Cir. 1996).

On summary judgment, the district court assumed without deciding that the appellants could establish a prima facie case of age discrimination and interference with prospective pension rights; but, given Idearc's performance-based explanation for termination, the court found that appellants had not provided evidence from which a reasonable jury could conclude Idearc's reason for the discharges--poor performance under the MSP--was pretextual and that age or pension related concerns were the actual reason for the discharges.

Whatever one thinks of eliminating weaker performing sales personnel in middle age or near to their pensions, poor performance in a job is a conventional business motive and not age

discrimination or purposeful interference under ERISA. Appellants do not deny that they were subject to discharge under the MSP. Instead, they argue that the MSP's percentile figure was raised to the 70th percentile level without a mathematical basis in January 2005 and left unchanged in January 2007, in alleged violation of the CBA, and that Idearc knew the revised MSP would capture too many employees for termination.

Reducing the "safe harbor" from the top 70 percent of employees ranked by performance to the top 30 percent (which was the effect of the January 2005 change) was amply explained not by age discrimination but by experience showing that the earlier safe harbor was so large that it prevented the MSP from capturing all but a few employees--far from the aimed-for removal target. In deposition testimony below, the Union conceded that Idearc acted with legal authority under the CBA in raising the MSP standards as it did.

Appellants argue, relying in part on the views of their expert, that the company and Union both misunderstood what the CBA required to justify the new 70 percent figure; but this is beside the point: the question here is not the CBA's meaning but the appellants' need to show that Idearc had fired them because of their age or to target their pension rights; merely to show that the parties to the CBA misunderstood their own document would remit

appellants to their CBA-based claims which they have not sought to appeal. See note 3, above.

Indeed, Idearc attempted to terminate only 28 employees for performance-based reasons over the life of the MSP, out of about 300 employees in the bargaining unit. Among the 28 employees Idearc attempted to terminate under the MSP, 22 appealed and 8 were successful. There was no significant difference between the average age of employees with successful and unsuccessful appeals--at 51.375 and 47.33 years old, respectively--and the fact that employees with successful appeals were slightly older on average tends to negate, rather than support, an inference of discrimination. The number of terminated employees does not come close to Idearc's original target of 10-15 percent, or about 30-45 per year.

In proffering these figures, Idearc did not count two employees, who were identified for termination and denied relief on appeal, but were kept on briefly to qualify for their service pensions after the Union alerted the company that these two were very close to vesting. Adding these employees to the mix does not significantly change the average ages already discussed, and Idearc's accommodation hardly supports the notion that Idearc was using the MSP to interfere with pension benefits.

Appellants point out that among Idearc's three sales channels as of 2007, Premise Sales (in which appellants worked) had

the highest average age at 51.5 years old, highest average years of service, and the highest termination rate under the MSP; Senior Telephone Sales followed in average age, service, and terminations; Telephone Sales employees were the youngest at an average age of 37.3 years old, the least experienced, and saw zero terminations under the MSP.

As it happens, Idearc says that the Telephone Sales channel was informally exempted from the MSP by agreement with the Union, but that many young, inexperienced, provisional employees in the group were dismissed outside the procedures of the MSP in numbers that would have raised that group's discharge rate above all others. Appellants say that proof of such an agreement is weak, but the whole dispute is beside the point.

The sales representatives in each channel were performing their sales tasks in a different context than those in the other two channels; and appellants were being measured against members of their peer group within their distinct channel. The desire to keep the stronger and discharge the weaker performing members of a group is not the purposeful age discrimination condemned by the ADEA or interference with pension rights under ERISA. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007) (requiring "discriminatory intent" for ADEA claims); Barbour v. Dynamics Research Corp., 63 F.3d 32, 38 (1st Cir. 1995), cert. denied, 516

U.S. 1113 (1996) (requiring "specific intent to interfere with the plaintiff's [ERISA] benefits").

Appellants say their own adequate performance is shown by accolades they received, some within semesters they failed under the MSP, or not long before their final failing semester and termination. But objective measures are used in part to avoid claims of discrimination; and crafting an MSP that better divides superior from inferior performance is a subject for collective bargaining, not a discrimination claim; that the MSP may have been an imperfect performance metric hardly shows that it was a mask for age discrimination or interference with pensions.

Two pieces of evidence stressed by appellants deserve brief comment. One is a statement made by a sales manager to plaintiff Rosenthal during a meeting in 2005 or 2006: "[T]hat's the problem with you old guys, you remember the way that it used to be." Such a stray remark to one person, made on a subject that Rosenthal could not recall, can hardly serve to show that discharges under an objective and negotiated merit plan were a pretext for age discrimination. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001).

Appellants also stress that Idearc was concerned about pension costs and saved a substantial amount in pension benefits as to the 20 employees who were terminated under the MSP. But employers, if they remain in business, are always concerned with

costs--pensions quite as much as salaries or commissions. Nothing suggests that the termination of the four appellants here was based on anything except their poorer performance in sales efforts as measured by the MSP.

Finally, appellants suggest that they were retaliated against for filing this lawsuit in the district court charging age discrimination and interference with ERISA rights. Such a retaliatory purpose by Idearc could create liability under either of the two statutes. 29 U.S.C. § 1140 (ERISA); 29 U.S.C. § 623(d) (ADEA). Appellants were discharged before they filed their lawsuit; but their theory is that the retaliation lay in a refusal to reinstate based upon an alleged promise to do so reflected in the 2008 CBA.

The alleged promise appears in a June 24, 2007 Letter Agreement included as an annex to the 2008 CBA ("the page 53 letter"). The page 53 letter, on its face, exempted from termination sales representatives failing the MSP in the first semester of 2007, and instead moved those employees into a "performance improvement plan." Idearc, say appellants, concealed the Letter and failed to reinstate them in retaliation for filing this suit on December 3, 2008--shortly before the 2008 CBA was adopted on December 7, 2008.

However, while the letter taken without context is arguably confusing, the evidence gathered in discovery confirms

Idearc's explanation that the page 53 letter was a proposal made in negotiating the 2008 CBA that was thereafter rejected by the Union. Then, after an impasse in negotiations in early December 2008, well after the preexisting CBA expired, Idearc implemented unilaterally the new performance improvement plan but applicable only to employees subject to discharge in the second semester of 2007, thus excluding persons such as the appellants.

The page 53 letter is (as appellants say) included in the CBA as an annex but only because, according to Idearc and the uncontradicted record evidence, the Union's bargaining representative requested that the letter be included for reference--but never as a commitment by the company. In deposition testimony in the district court, the Union representative confirmed that the page 53 letter is a "moot document" and she "just wanted people to see what we had been talking about for 17 months." No contrary testimony was adduced by appellants.

Appellants say that the tension between the plain language of the page 53 letter and the bargaining representative's account at least raises a genuine issue of material fact for trial. But the relevance of a June 2007 letter annexed to a December 2008 CBA without any explicit adoption of the former by the latter is hardly self-evident, and appellants have pointed to no evidence to rebut credible assertions by both parties to the CBA as to the

limited office of the letter.  The premise of the retaliation claims thus fails.

Affirmed.