# United States Court of Appeals

## For the First Circuit

No. 10-2276

HERNÁN ACEVEDO-PARRILLA; NITZA I. MEDINA MARTÍNEZ;
and the conjugal partnership composed between them,

Plaintiffs, Appellants,

v.

NOVARTIS EX-LAX, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. Senior District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Vilma M. Dapena-Rodríguez, for appellants.
Enrique R. Padró-Rodríguez, with whom Pedro J. Manzano-Yates
and Fiddler, González & Rodríguez, P.S.C., were on brief for
appellee.

October 10, 2012

**TORRUELLA**, **Circuit Judge**.  Plaintiff-Appellant Hernán Acevedo-Parrilla ("Acevedo") appeals the district court's award of summary judgment to his former employer, Novartis Ex-Lax ("Ex-Lax" or "the company"), on his claims of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634.  Upon careful review of the record, we find that it holds sufficient evidence from which a jury could conclude that the company's reason for terminating Acevedo was pretextual, and that the true reason for his termination was discriminatory based on his age.  We therefore reverse the district court's grant of summary judgment and remand.

## I. Background

Because our review is from a grant of summary judgment, we set forth the background facts, as supported by the record, "in the light most favorable to the non-moving party," in this case, Acevedo.  Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 444 (1st Cir. 2009).

### A. Acevedo's History at Ex-Lax

Acevedo was born in 1951 and is a trained mechanical engineer.  For twenty years, from 1975 to 1995, Acevedo worked in various posts as an engineer in the manufacturing, government, and pharmaceutical sectors, a trajectory that included the assumption of supervisory roles and exemplary performance evaluations.  In 1996, the General Manager of Ex-Lax -- a pharmaceutical company

that manufactures over-the-counter products, including laxatives -- approached Acevedo and offered him the position of Maintenance and Engineering Manager at the company's site located in Humacao, Puerto Rico.  Acevedo accepted the position and held it for the next eleven years, until he was terminated in 2007.  At the time of his termination, Acevedo was 56 years old.

Acevedo's main responsibility as the Maintenance and Engineering Manager at Ex-Lax consisted of keeping the plant's facilities in optimum condition, including facilities associated with the company's production machinery, treatment plant, landscaping, and building services.  Acevedo's department also provided engineering support to other departments in the company, supervised major contract works, and oversaw the provision of services such as pest control, cleaning, and sanitation by outside contractors.  In all, the job required that Acevedo supervise approximately twelve employees, including a maintenance technician, several mechanics, a stock room clerk, a groundskeeper, a packaging engineer, and a facilities project engineer.

For most of his career at Ex-Lax, Acevedo received positive performance reviews that fluctuated between overall ratings of "fully met expectations" and "exceeding expectations."[1]

---

[1]  Ex-Lax's performance reviews contained both objective and subjective evaluations, respectively titled the "Objectives" and "Values and Behaviors" sections.  For each performance review, the employee's execution in various areas would be rated under both sections.  This entailed rating the accomplishment of specific

From 2000 to 2006, Acevedo was awarded performance[2] bonuses of over $10,000.00 in each of those years, except for 2004, when his bonus totaled only $6,244.00. In 2007, the year of his termination, both Acevedo's immediate supervisor at the time, Carlos Ceinos ("Ceinos"), and Ceinos's supervisor, Iván Martí ("Martí"), approved a bonus of $13,166.00 for Acevedo's performance in 2006.

**B. Ceinos's Superintendence as Site Leader**

In 2003, Ex-Lax hired Ceinos for the position of Site Leader, which made him responsible for overall operations at the company's Puerto Rico site. As part of his duties, Ceinos evaluated the performance of all of Ex-Lax's department managers, including Acevedo. Ceinos was also charged with reviewing "unplanned deviation reports" generated by investigation teams at the site. These reports contained analyses of deviations from Ex-Lax Standard Operating Procedures ("SOPs"), and were prepared in order to determine the "root cause" of particular deviations, establish appropriate corrective and preventive actions, and gauge the impact of the deviation on Ex-Lax's products.

---

"objectives" (e.g., compliance with protocols) and the fulfillment of particular qualities or "values" (e.g., competence and leadership). Ratings were given on a scale of 1 through 3 (1 = "Partially Met Expectations," 2 = "Fully Met Expectations," and 3 = "Exceeded Expectations"), and were adjudicated for distinct areas as well as tallied for an "Overall Rating."

[2] As we will explain infra, Ex-Lax maintains that its bonuses are not tied to the individual's performance per se, but rather respond to a myriad of considerations, including the performance of the company as a whole.

-4-

According to Elizabeth Rodríguez ("Rodríguez"), Ex-Lax's Human Resources ("HR") Manager from March 1997 to May 2005, upon assuming the role of Site Leader, Ceinos asked Rodríguez to investigate "the inclinations" of employees "who had reached retirement age" to determine "what their wishes were regarding leaving the company." Rodríguez testified that this request was part of Ceinos's new "recruitment plan," instituted for the purpose of "proceed[ing] to substitute the persons who were of retirement age." In order to qualify for retirement, employees had to have accumulated at least five years of service with the company and be 55 years of age or older. Although Rodríguez stated that "[t]here was no pressure as such" exerted upon employees to retire as part of Ceinos's plan, she gave at least one example of an employee at retirement age who chose not to retire after being asked and was subsequently moved to another department, resulting in what Rodríguez characterized as a "demotion."

Information provided by Ex-Lax in answers to interrogatories reveals that, after 2003 -- the year in which Ceinos became Site Leader -- the company hired approximately 140 employees, 114 of whom were less than forty years of age. In the same period, Ex-Lax fired only 17 employees, 15 of whom were older than forty.

## C. The 2004 and 2006 Incidents

Not long after Ceinos became Site Leader, Acevedo began to experience performance problems at the company. Ceinos became aware of a number of incidents involving Acevedo's department that occurred from 2004 to 2006 and factored these into Acevedo's performance reviews. In 2004, such events included (1) the recorded presence of rodents in the chocolate manufacturing and packaging areas, (2) the recorded presence of bacteria in two lots of Ex-Lax's Gas-X Super Extra Strength Soft Gel 30's, and (3) a packaging process deviation.

The first of these incidents transpired in January of 2004, when a rodent was found in the packaging area near the chocolate line, causing production to be put on hold. A subsequent investigation conducted by Ex-Lax personnel, and in which Acevedo participated, determined that the rodent had likely entered the packaging area during a building renovation that began on December 30, 2003, during which contractors accessed the plant through the cafeteria's emergency exit door and the employees' entrance door. The investigation team found that these doors had remained open for longer than necessary, but the resulting report did not specifically mention a mistake or error on the part of Acevedo or his department.

Later, in June of 2004, an employee from One Source, Ex-Lax's building services contractor, found traces of ceiling tile

on the floor of the chocolate manufacturing area. It was later confirmed that this was the result of rodent activity in the ceiling above the chocolate room. After the setting of traps and the capture of one small rodent, a maintenance technician found a hole in an unused exhaust fan in the ceiling of the Quality Assurance Laboratory. The exhaust fan was immediately removed and the hole sealed. A subsequent investigation concluded it was highly probable that the rodent gained access through the previously uncovered hole. The discovery of this latter rodent activity caused the company to "reject," or decommission, a batch of chocolate laxative.

The second 2004 event took place in September and involved the detection through laboratory tests of a bacteria in two lots of Ex-Lax's Gas-X Super Extra Strength Soft Gel 30's. This triggered the Quality Assurance Department's rejection and disposal of the lots. An investigation team comprised of Ex-Lax personnel, including Acevedo, later concluded that the bacteria could have originated either from mold contamination in (closed and unused) bathrooms located near the production area, or from the fact that one of the operators who participated in the inspection of the lots was confirmed to be sick at the time of the inspection. Acevedo indicated through testimony that contamination in the bathrooms could have been prevented had there been an SOP in place regarding their daily cleaning.

The third and final 2004 event also occurred in September, when the personnel from Acevedo's department were installing and setting up a new brush box for the packaging of a lot of Gas-X Maximum Strength Soft Gels 50's. During the set-up, they became aware that the positioning of the brushes inside the brush box was not correct, so they changed it. They then installed a new acrylic box in the brush box and evaluated the effect of the acrylic box on the packaging operation. Although these actions did not have a negative impact on the quality of Ex-Lax's product, both actions were taken without the appropriate deviation approval from the Production and Quality Assurance Departments and, therefore, violated Ex-Lax's Change Control Procedure. The record reveals that some of the personnel involved in this event may not have received adequate training in the change control procedures. After the brush box incident, all personnel, supervisors, and managers in Acevedo's department were so trained.

Ceinos testified that he became aware of each of the 2004 incidents through their corresponding investigative and/or unplanned deviation reports. He also indicated that he attributed responsibility for each of the incidents to Acevedo based on his general job description and responsibilities. Accordingly, Ceinos recorded them in Acevedo's 2004 annual performance review, in which he gave Acevedo a low overall rating of 1, or "partially met expectations." As a result, Ex-Lax required that Acevedo complete

a Performance Improvement Plan ("PIP"), lasting from March 22 to June 22, 2005. The PIP identified Acevedo's specific performance problems and outlined the personalized improvement plan that he was expected to complete. According to the terms of the PIP, Ex-Lax gave Acevedo ninety days to successfully complete the plan and achieve a status of "fully meeting expectations" in order to retain his current position at the company, with the caveat that Ex-Lax always reserved the right to take appropriate action, including termination, if Acevedo's improvement did not continue. Acevedo complied with the requirements of his 2005 PIP, and Ceinos subsequently rated him as "fully met expectations" in both the mid-year and annual 2005 performance reviews.

In 2006 Ceinos again held Acevedo responsible for a number of incidents which he deemed to have affected Acevedo's performance. The first of these incidents involved a change in equipment that resulted in Total Organic Carbon ("TOC") levels above the acceptable limit in the purified water used for production. As a result, Ex-Lax had to discard almost forty thousand dollars' worth of manufactured products. The record reflects that Acevedo was on vacation at the time this occurred and that another employee, Angel Alsina ("Alsina"), was assigned supervisory duties during his absence.

The second incident involved the potential contamination of a chocolate batch after a fumigation (or "fogging") procedure

was performed in the chocolate manufacturing area by Ecolab, Ex-Lax's pest control services contractor. The company's Quality Assurance and Compliance Departments had to decommission the batch of chocolate prepared on the day of the fogging. Ex-Lax stated that this represented a loss of just over ninety thousand dollars to the company. The unplanned deviation report indicated that the Ecolab employee who applied the insecticide may not have been given clear instructions due to an inadequate written procedure addressing what to do before, during, and after a pest control activity takes place.

Third, and finally, based on two routine walks he took to evaluate the plant's facilities, Ceinos found that there was a general lack of cleanliness and organization in the spare parts room, the machine shop, and the purified water room. Ultimately, Acevedo received a mixed evaluation in his 2006 annual performance review -- Ceinos's overall rating in the "objectives" portion amounted to "fully met expectations," while his overall rating in the "values and objectives" section reached only "partially met expectations."

## D. "Ageist" Remarks and Acevedo's Termination

Acevedo alleges that on two occasions, in August and December of 2006, Ceinos commented to him that "the main problem at the [Ex-Lax] plant[] were the persons who had been in the company for a long time," because those persons "were not performing."

Acevedo testified that Ceinos said this in the context of their conversation about "the problems that had existed during the year" and Ceinos's evaluation of his performance.

On February 23, 2007, Acevedo was terminated from his employment at Ex-Lax, without prior notice and effective immediately.[3]  Acevedo testified that, at the time of his discharge, the reasons Ceinos gave for his termination were the "fogging" incident, the purified water (or TOC) incident, and "the disorganization of the rooms" -- in other words, the 2006 incidents.  Ceinos testified that, although he never explicitly warned Acevedo that these incidents could lead to his termination, he had related to Acevedo that "too many incidents had occurred with his department, that [they] were still having problems [because] the department would not comply with the procedures," and that the maintenance and engineering personnel "apparently[] were not well trained."

## E. Acevedo's Replacement

In February 2007, 34-year-old Mariely Rivera ("Rivera") was hired to replace Acevedo as Maintenance and Engineering Manager.  Just as Acevedo had before her, Rivera reported directly

--------

[3]  Although he was HR Manager at the time, José Pabellón ("Pabellón") could not explain why Acevedo did not receive prior notice of his termination through a letter of dismissal.  He also did not remember whether Acevedo was placed on a progressive discipline program prior to his termination.  Pabellón testified that he and Ceinos did not discuss Acevedo's dismissal, nor did Pabellón recommend it.

to Ceinos. Ceinos testified that Rivera's interview took place before December of 2006, prior to Acevedo's dismissal.

In October of 2007, an internal audit of Rivera's department was conducted, which revealed persistent violations of Ex-Lax's SOPs. These violations included the department's failure to: follow proper documentation practices, conduct certain procedures relating to the purified water system, complete cleaning and sanitation in certain areas with the required frequency, and complete certain pest control procedures on the required monthly basis. Many of the same deficiencies would also be recorded in a subsequent internal audit report dated May 2008. In addition, Ex-Lax's records reveal a July 2007 unplanned deviation report indicating that an increase in mold and yeast counts had been detected in the packaging area. One of the root causes identified for this deviation was "improper area cleaning and sanitation." Notwithstanding these incidents, Rivera received an appraisal of "fully met . . . expectations" in her 2007 annual performance evaluation, signed by Ceinos. The evaluation did not reference any of the aforementioned infractions relating to facilities management.

In 2008, a string of incidents occurred in which animals, including numerous insects, a lizard, and rats, entered the plant. These were documented by investigation teams in at least four separate unplanned deviation reports. The reports concluded that

the entrance of the animals was caused by a major construction project that was being conducted in the manufacturing area. Ceinos admitted that he had knowledge of these incidents at the time. Nonetheless, Rivera's testimony reflects that Ceinos did not comment on the incidents in her performance evaluations that year, and that no employee was held responsible for the same. Ceinos awarded Rivera an overall manager appraisal equivalent to "fully met expectations" in her 2008 annual performance review.

## F. Procedural History

On February 12, 2008, Acevedo brought this suit against Ex-Lax, asserting that his former employer terminated him due to his age, in violation of the ADEA and various Puerto Rico statutes. On March 25, 2009, Ex-Lax moved for summary judgment, arguing that Acevedo failed to establish a prima facie case of age discrimination because he could not show that he was fired despite having met the company's legitimate work expectations. Ex-Lax also contended that, even if Acevedo could make such a showing, he could not put forth sufficient proof to establish that the company's proffered reason for his termination -- failure to meet his employer's legitimate work expectations -- was pretextual. Acevedo opposed Ex-Lax's motion by reaffirming the pretextual nature of the company's reasons for his dismissal and pointing to what he deemed sufficient direct proof of discrimination. On September 30, 2010, the district court granted Ex-Lax's summary judgment motion,

dismissing both the federal and supplemental claims. See Acevedo-Padilla v. Novartis Ex Lax, Inc., 740 F. Supp. 2d 293 (D.P.R. 2010). This timely appeal followed.

## II. Discussion

### A. Standard of Review

Our review of a district court's grant of summary judgment is de novo, "resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the nonmoving party." Sánchez-Rodríguez v. AT&T Mobility of P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Kuperman v. Wrenn, 645 F.3d 69, 73 (1st Cir. 2011)) (internal quotation marks omitted). In so doing, we "independently weigh[] the merits of [the] motion . . . without deference to the reasoning of the district court." Hughes v. Boston Mut. Life Ins. Co., 26 F.3d 264, 268 (1st Cir. 1994).

Summary judgment is properly granted only where the movant -- in this case, Ex-Lax -- "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, to survive summary judgment, Acevedo must establish a genuine issue of material fact as to whether his dismissal was motivated by age-based discrimination. See Carroll v. Xerox Corp., 294 F.3d 231, 236 (1st Cir. 2002) ("Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a

-14-

genuine issue for trial."). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

**B. Compliance with Local Rule 56**

As a preliminary matter, we note that in considering the parties' filings in support of (and opposition to) Ex-Lax's motion for summary judgment, the district court determined that both Acevedo and Ex-Lax ran afoul of the District of Puerto Rico's anti-ferret rule, Local Rule 56(c). See D.P.R. Civ. R. 56(c) (requiring party opposing summary judgment to submit a separate, short, and concise statement of material facts admitting, denying or qualifying the corresponding facts that support the motion, with record citations in support). Acevedo submitted an opposing statement of material facts, but included additional information as to each opposed fact that did not specifically correlate to Ex-Lax's proposed facts. See id. (indicating that "opposing statement may contain in a separate section additional facts") (emphasis added); see also Carreras v. Sajo, García & Partners, 596 F.3d 25, 32 (1st Cir. 2010). Ex-Lax, in turn, acted in violation of the local rule because it "cit[ed] numerous pages of [its] reply when opposing [Acevedo's] facts, instead of providing concise and specific responses." Acevedo-Padilla, 740 F. Supp. 2d at 299.

-15-

As a result, the district court, in an appropriate exercise of its discretion, ruled that it would disregard any additional facts provided by Acevedo when denying or qualifying Ex-Lax's statement of uncontested facts. Id. at 298-99. However, to this determination it tacked on a ruling that the supplemental facts properly included in Acevedo's separate section of "additional facts" would nonetheless be "deemed admitted when supported by the record." Id. The district court did not explain what effect, if any, Ex-Lax's own transgression to the local rule had on the court's analysis of the facts.

Our review of the district court's application of Local Rule 56 is for abuse of discretion. Carreras, 596 F.3d at 31. Ex-Lax generally points to this ruling by the district court to support its position on appeal, but it does not appear to us that the district court's ruling had any practical effect on its summary judgment determination. Indeed, the district court ultimately relied on Acevedo's separate section of additional facts, as references to that document can be found throughout the opinion; but it did so only "when supported by the record, and not properly controverted by Ex-Lax." Acevedo-Padilla, 740 F. Supp. 2d at 299. We can discern no error by the district court and, for purposes of this appeal, we have likewise only considered those facts ("additional" or otherwise) properly presented and supported, per Local Rule 56.

## C. Acevedo's Age Discrimination Claim

### 1.  The ADEA and McDonnell Douglas

The ADEA provides that it is unlawful for an employer to "refuse to hire or to discharge any individual or otherwise discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  A plaintiff asserting a claim under the ADEA has the burden of establishing "that age was the 'but-for' cause of the employer's adverse action."  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177 (2009).  Such a plaintiff is not required to proffer direct evidence of discrimination, and may meet his burden through circumstantial evidence.  To be sure, we have acknowledged that "ADEA plaintiffs rarely possess 'smoking gun' evidence to prove their employers' discriminatory motivations."  Vélez, 585 F.3d at 446 (quoting Arroyo-Audifred v. Verizon Wireless, Inc., 527 F.3d 215, 218-19 (1st Cir. 2008)).  In the absence of direct evidence of age discrimination, we evaluate ADEA claims under the three-stage burden-shifting framework of

<u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792, 802-05 (1973).[4]
<u>Cameron</u> v. <u>Idearc Media Corp.</u>, 685 F.3d 44, 48 (1st Cir. 2012).

In the first of the three <u>McDonnell Douglas</u> stages, the plaintiff has the initial burden of establishing a prima facie case of discrimination. In an ADEA action this requires a showing "[1] that he or she was at least 40 years old at the time of discharge; [2] that he or she was qualified for the position but [3] was nevertheless fired; and [4] the employer subsequently filled the position." <u>Id.</u> (citing <u>Vélez</u>, 585 F.3d at 447). Doing so "gives rise to an inference that the employer discriminated due to the plaintiff's advanced years." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>, 950 F.2d 816, 823 (1st Cir. 1991). If the plaintiff is able to establish a prima facie case, the burden shifts in the second stage to the employer, who "must then produce a legitimate, non-discriminatory reason for termination." <u>Cameron</u>, 685 F.3d at 48. If the employer is able to do this, "the ball returns to the

---

[4] Although Acevedo claims that certain statements made by Ceinos in August and December of 2006 constituted ageist remarks, on appeal he does not characterize his testimony about those remarks as "direct" evidence of age discrimination sufficient to carry his burden "that age was the 'but-for' cause" of his dismissal from Ex-Lax. <u>Gross</u>, 557 U.S. at 177. Nor, as Ex-Lax points out, does he contest the district court's determination that "[the] two isolated comments . . . are not direct evidence of [age] discrimination." <u>Acevedo-Padilla</u>, 740 F. Supp. 2d at 313. Acevedo's argument is specifically that Ceinos's remarks were evaluated by the district court in isolation, rather than as part of the totality of the evidence suggesting pretext. Accordingly, we proceed with the <u>McDonnell Douglas</u> burden-shifting framework and evaluate the evidence of Ceinos's remarks <u>infra</u>, as part of the pretext analysis.

plaintiff's court, in which [he] must prove by a preponderance of the evidence that [the] defendant's alleged nondiscriminatory reason was in fact a pretext for discrimination." Goncalves v. Plymouth Cnty. Sheriff's Dep't, 659 F.3d 101, 105 (1st Cir. 2011).

### 2. The Prima Facie Case

As the district court noted, Acevedo is a person over forty years of age, who was fired by his employer and subsequently replaced by someone younger. He therefore neatly satisfies three of the four prongs in the prima facie case. The only contentious question on appeal is whether Acevedo meets the second prong: that he was qualified for the position that he held. We linger briefly here to clarify some points that might have been obfuscated by the district court's analysis.

Ex-Lax's theory of the case is that Acevedo's termination was a lawful business decision, unrelated to his age, that was based on Acevedo's failure to comply with the company's established quality control standards and, hence, with its legitimate job expectations. In particular, Ex-Lax points to the 2004 and 2006 incidents that occurred in the Maintenance and Engineering Department, memorialized in unplanned deviation reports, and on which Ceinos allegedly based his termination decision. This constitutes Ex-Lax's alleged nondiscriminatory reason for dismissing Acevedo, which comes into play at the second stage of our McDonnell Douglas burden-shifting analysis, discussed infra.

However, Ex-Lax argued before the district court that these facts, if believed, meant Acevedo also failed the second prong of the prima facie case.

Although the district court ultimately determined that Acevedo had established a prima facie case under the ADEA, it did so only after considering Ex-Lax's alleged reason for dismissal, assessing Acevedo's proffered counterpoints, and concluding that it was unclear whether Acevedo had been responsible for several of the pointed-to incidents. Acevedo-Padilla, 740 F. Supp. 2d at 314-15. This constituted error on the district court's part. See Vélez, 585 F.3d at 448 (finding as error that the district court "accepted for the purpose of the prima facie analysis [the employer's] stated reason for firing [the plaintiff] as proof that he was not qualified for the . . . job"); Meléndez v. Autogermana, Inc., 622 F.3d 46, 51 (1st Cir. 2010) (holding that "we cannot consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case") (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir. 2003) (en banc)). A plaintiff is not required, at the prima facie stage, to disprove the defendant's proffered nondiscriminatory reason for taking an adverse employment action. We have explained that doing so "bypass[es] the burden-shifting analysis and deprive[s] the plaintiff of the opportunity to show [such] reason was in actuality a pretext designed to mask discrimination."

Vélez, 585 F.3d at 448 (quoting Wexler, 317 F.3d at 574); see also Meléndez, 622 F.3d at 51 (same).

A plaintiff's prima facie burden under the "qualified" prong of the prima facie case, see Cameron, 685 F.3d at 48, is met if he presents "evidence which, if believed, prove[s] that he was doing his chores proficiently." Freeman v. Package Mach. Co., 865 F.2d 1331, 1335 (1st Cir. 1988) (finding the second prong met despite "defendant's adamantine insistence that plaintiff's job performance was not up to snuff"); see also Hebert v. Mohawk Rubber Co., 872 F.2d 1104, 1112 (1st Cir. 1989) (finding plaintiff's prima facie burden met where, despite employer's challenge of his account regarding the "adequacy of his job performance," plaintiff "adduced a quantum and quantity of evidence of his competence . . . sufficient to prevail if a jury believed his version of the facts and disbelieved defendant's"). In this case, the record reflects that Acevedo is a trained mechanical engineer with prior, well-rated experience in the manufacturing and pharmaceutical sectors, including experience as a supervisor. Moreover, before his termination from Ex-Lax, Acevedo had a long history of employment at the company, spanning an eleven-year period, with overall positive reviews. We find that these facts are enough to meet what we have regularly described as a "low standard" for the prima facie showing in a discrimination case. Vélez, 585 F.3d at 447 (quoting Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 44 (1st Cir.

2002)); see also Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004) (describing standard as "modest").

### 3. Ex-Lax's Explanation and Acevedo's Showing of Discrimination

Acevedo having triggered the "rebuttable presumption that [Ex-Lax] violated the ADEA," Ex-Lax now has "the burden of production -- as distinguished from the burden of proof -- . . . to articulate a legitimate, nondiscriminatory basis for its adverse employment action." González, 304 F.3d at 68-69. We have already discussed Ex-Lax's contention that Acevedo's termination was a business decision unrelated to his age. Ex-Lax argues that the decision was based on Acevedo's supervisor's understanding -- reflected in Ceinos's deposition testimony -- that Acevedo consistently failed to comply with the duties and objectives of his position, particularly with regard to the observance of quality control standards in connection with the plant's equipment and facilities. Ex-Lax's briefing points to all of the previously referenced 2004 and 2006 incidents, which were recorded in investigative and unplanned deviation reports, and which it contends "were within the scope of Acevedo's responsibilities" and "had a negative impact on the plant's operations." We have no trouble finding on this basis that Ex-Lax has articulated a legitimate, nondiscriminatory reason for firing Acevedo. See, e.g., Dávila v. Corp. de P.R. Para La Difusión Pública, 498 F.3d 9, 16 (1st Cir. 2007) (finding that sworn statement by director of

employer's legal division that appellant was terminated due to poor work performance "by itself, provide[d] sufficient basis for the district court's conclusion that the [employer] articulated a nondiscriminatory motive for the appellant's discharge").

Thus, we reach "the third and final phase of burden-shifting," at which point "the McDonnell Douglas framework falls by the wayside." Mesnick, 950 F.2d at 824. The court's focus now turns to "the ultimate issue," which is whether -- after assessing all of the evidence on the record in the light most favorable to Acevedo -- "[he] has raised a genuine issue of fact as to whether the termination of [his] employment was motivated by age discrimination." Domínguez-Cruz, 202 F.3d at 431. In order to meet this burden, "[Acevedo] must offer some minimally sufficient evidence, direct or indirect, both of pretext and of [Ex-Lax's] discriminatory animus." Mesnick, 950 F.2d at 825 (emphasis added).

We first consider Acevedo's attestation of pretext, "having in mind that courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)).

### a. Acevedo's Evidence of Pretext

Acevedo argues that Ex-Lax's stated reasons for his dismissal betray the element of pretext because they are both internally inconsistent and incompatible with Acevedo's performance record. On this point Acevedo has met the "minimally sufficient" standard to proceed with his case. We have consistently stated that mere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext. See Webber v. Int'l Paper Co., 417 F.3d 229, 238 (1st Cir. 2005) ("[A]n employee's opinion of the efficacy of an employment decision, standing alone, cannot supplant the employer's business judgment")). However, Acevedo has presented here more than a simple disagreement with the correctness of Ceinos's decisions; he has proffered evidence sufficient to raise an issue of fact as to whether Ceinos himself truly believed Acevedo's performance was unsatisfactory. See, e.g., Gray v. New England Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986) (explaining that "in assessing pretext . . . [the court's] focus must be on the perception of the decisionmaker, i.e., whether [the decisionmaker] perceived the plaintiff as violating . . . company policies and whether this perception was credible and reasonable").

To begin, while it is undisputed that Acevedo's job description encompassed a duty to oversee the general upkeep of the plant's facilities, there are material issues of fact as to whether

Acevedo was to blame for four of the incidents involving plant facilities that the company has cited as triggers for his termination.  The district court noted as much in its opinion and order, which pinpointed as problematic for Ex-Lax's position the record surrounding: the 2004 microbial incident, for which more than one possible cause was identified in the unplanned deviation report; the 2004 packaging process deviation, which had no negative effect on the quality of Ex-Lax's products; the 2006 TOC incident, during which Acevedo was not on duty; and the 2006 fogging incident, which the investigation report concluded was due to inadequate written procedures for pest control operations.[5]  See Acevedo-Padilla, 740 F. Supp. 2d at 314-15.  We must resolve all evidentiary conflicts and draw all reasonable inferences in favor of Acevedo at this stage.  See Sánchez-Rodríguez, 673 F.3d at 9. The fact that there is uncertainty regarding whether Acevedo was responsible for the pointed-to incidents indicates that there is a question for a jury to resolve as to whether the employer did in fact rely on these incidents in making its termination decision.

[5]  We note that there is a question raised by Acevedo whether he was directly responsible for developing the applicable written procedures referenced in the report.  While Ceinos testified that the head of each department submits procedures to the Quality Assurance Department for its approval, suggesting that Acevedo was responsible for developing the same for his department during his tenure, both Acevedo and his replacement, Rivera, testified that they were only responsible for "administering" and "implementing" such procedures, as determined by Quality Assurance.  It is also telling that the job description for the position does not include any mention of SOP development.

-25-

See Domínguez-Cruz, 202 F.3d at 432-33 (inconsistencies in employer's performance explanation, including doubts "whether [plaintiff] was directly responsible for two of the alleged violations," deemed relevant to finding of pretext).

Furthermore, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)) (internal quotation marks omitted). In particular, Acevedo has sufficiently demonstrated potential inconsistencies in Ceinos's testimony as to both the microbial and TOC incidents. A reasonable factfinder could conclude that these inconsistencies call into question Ceinos's reasons for terminating Acevedo, namely, that Acevedo was not complying with the duties and responsibilities of his position. For instance, regarding the 2004 microbial incident, Ceinos stated that it was Acevedo's responsibility to have an SOP in place to ensure that the bathrooms remained adequately cleaned. However, Ceinos also stated that he could not recall whether there was in fact an SOP in place at the time the incident occurred. In addition, with regard to the 2006 TOC incident, Ceinos testified that he held Acevedo accountable despite the fact that he was off duty on that day, because Acevedo was ultimately responsible for "mak[ing] sure that [the person he put in charge] [was] qualified

-26-

to exercise th[at] function." Ceinos nonetheless later acknowledged that Alsina -- the person who was put in charge and actually authorized the change in equipment -- "is a very qualified person" who still works for Ex-Lax. The employer's contemporaneous beliefs are a vital consideration because "[i]n assessing pretext, a court's 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." Mesnick, 950 F.2d at 824 (quoting Gray, 792 F.2d at 256); see Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000) ("[T]he question is not whether [the plaintiff] was actually performing below expectations, but whether [the employer] believed that [he] was.").

Acevedo also argues that pretext may be inferred from Ceinos's reliance on the microbial incident and the packaging process deviation of 2004 because both incidents had been previously addressed through Acevedo's 2005 PIP. According to Rodríguez's deposition testimony, under Ex-Lax's HR policy, if an employee succeeded at a PIP, the factors that led to the PIP could not be used in support of a termination decision. See Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 68-69 (1st Cir. 2008) (noting that "pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices," yet finding the principle inapplicable in the specific case, where plaintiff did not show existence of a standard

-27-

policy or practice).  On the other hand, the PIP itself indicated the possibility of adverse action, including dismissal, against Acevedo if his improvement did not continue.  This evidence presents a contested issue of material fact as to Ex-Lax's disciplinary procedures, and it should be for a jury to decide whether Rodríguez's testimony about the PIP procedure is credible.

It is undisputed, however, that Acevedo successfully complied with the 2005 PIP, was rated as having "fully met expectations" in both the mid-year and annual 2005 performance reviews, and -- despite the 2006 incidents that Ceinos points to -- received a bonus of $13,166.00 for his performance in 2006 that was approved by Ceinos himself.[6]  These seemingly incongruous facts might lead a reasonable juror to disbelieve Ceinos's contention that his decision to terminate Acevedo was based purely on a poor performance record.  See Santiago-Ramos, 217 F.3d at 56 (a plaintiff "can . . . establish pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions

---

[6]  Against this proposition, Ex-Lax argues that its bonuses "are not based exclusively on each employee's performance;" rather, they are "based on the performance of Ex-Lax's facility in Puerto Rico," the organization as a whole, "and the performance of the division." While we acknowledge that "a company is ordinarily in the best position to assess the meaning of its own [policies]," Vélez, 585 F.3d at 450, it appears on this record that Ex-Lax has not presented evidence to support its assertions about the bonus policy.  Given this lack of evidence, "a reasonable trier of fact" might "infer that [Ex-Lax] would not have sent [Acevedo] even generic commendations if it were truly dissatisfied with [his] job performance." Feliciano de la Cruz, 218 F.3d at 7.

in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'" (quoting Hodgens, 144 F.3d at 168)).

Acevedo raises an additional, correlative argument that his dismissal deviated from Ex-Lax's policy requiring adherence to a progressive disciplinary program. Both Rodríguez and Pabellón testified that Ex-Lax disciplinary actions normally followed successive steps, beginning with an orientation to the employee, followed by a series of verbal and written warnings, a potential suspension, and ultimately ending with dismissal. Pursuant to this policy, all disciplinary actions (including termination) had to be approved by the HR Department, and supervisors had to prepare informative memorandums indicating the reasons for termination prior to an employee's dismissal. None of these steps were taken in Acevedo's case. "[E]vidence that standard procedure was not followed is directly relevant to [Acevedo's] burden of demonstrating pretext." Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998). We acknowledge, as the district court did, see Acevedo-Padilla, 740 F. Supp. 2d at 318, that other testimony by Pabellón suggested that Ex-Lax's progressive disciplinary policy did not apply to exempt (or management) employees, who were allegedly routinely chastised through memorandums and/or performance reviews. This was arguably the method employed in

Acevedo's case, but it does not answer the question why the decision to dismiss Acevedo did not require submission of the reasons for termination to the HR Department, a step that, in Pabellón's estimation, did apply to all employees.  See Lattimore v. Polaroid Corp., 99 F.3d 456, 467 (1st Cir. 1996) (holding, in a case involving allegations that defendant-employer had "deviated from its established policies and practices," that "evidence of pretext," although "thin, disputed and susceptible to varying interpretations, . . . is sufficient to create a jury question").

Without much question, Acevedo has offered at least "minimally sufficient evidence" that the reasons given by Ex-Lax for his discharge were pretextual.  Mesnick, 950 F.2d at 825.

### b. Acevedo's Evidence of Discriminatory Intent

While the above evidence could support the conclusion that Ex-Lax's explanations for Acevedo's discharge were pretextual, this is not enough for Acevedo to defeat summary judgment; he must also show that the pretextual reasons were "intended to cover up the employer's real motive: age discrimination."  Id. at 824.  We find that Acevedo's proof, taken in the aggregate, is sufficient to raise a question of material fact regarding whether the true reason behind his termination was age discrimination.

First, we consider Acevedo's argument that certain comments made to him by Ceinos in August and December of 2006 constituted ageist remarks.  Acevedo contends, and Ex-Lax concedes,

-30-

that Ceinos told him that the problem at Ex-Lax lay in the fact that employees "who had been in the company for a long time[] were not performing." Acevedo's testimony reflects that the context of these remarks concerned "the problems that existed at the company during the year" and an evaluation that Ceinos would be conducting of Acevedo's work. Acevedo maintains that Ceinos was specifically referring to the older employees who worked in the maintenance group, and that these comments, combined with their proximity to his dismissal, connote a discriminatory intent. Ex-Lax, in turn, argues that Ceinos's remarks were unrelated to the decisional process itself, were not reasonably proximate to the date of Acevedo's discharge, and do not necessarily imply an illegal animus.

"It is settled that statements made by decisionmakers can evidence age discrimination," Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir. 1998), and Ceinos was certainly the decisionmaker in Acevedo's case. See id. at 341, 347 (remark that it would be a good time "to get rid of some of the older mediocre managers" had a "direct bearing on age discrimination because [the speaker] made the decision to terminate"). While the remarks in this case were arguably non-discriminatory -- i.e., Ceinos did not allude to Acevedo's or any employee's actual age when he made the comment -- to the extent that the comments were made in reference to Acevedo's performance and focused on his department, they could

-31-

also be interpreted by a reasonable factfinder as referring to the older employees who had remained longer on the job.[7] See Hodgens, 144 F.3d at 167, 171 ("Statements by supervisors carrying the inference [of] . . . animus against protected classes of people or conduct are clearly probative of pretext, . . . even if that inference is not the only one that could be drawn from the comment.") (emphasis added) (citations omitted).

Moreover, in evaluating such remarks made by a decisionmaker, this court has considered their temporal proximity and causal connection to the decision to discharge. Cf. Meléndez, 622 F.3d at 54-55 (affirming plaintiff's inability to establish that employer's remarks exhibited discriminatory animus because of failure to prove that comments were temporally and causally connected to his termination). Drawing all inferences in the light most favorable to Acevedo, the remarks were made, at most, six months prior to his termination and expressed Ceinos's displeasure at older employees' long tenure at the company. A jury could therefore infer that Ceinos's statements were temporally and causally related to Acevedo's discharge. See, e.g., Walton v.

_____

[7] The district court determined that Acevedo's stated perception regarding Ceinos's comments was "self-serving" and "conclusory," because he failed to submit a particular page from his deposition transcript. Acevedo-Padilla, 740 F. Supp. 2d at 313 n.12. We understand, however, that the same inference can be drawn from the testimony that was properly submitted, and we therefore need not disregard the possibility that a reasonable factfinder would interpret the remarks as referring to the older maintenance and engineering employees.

<u>Nalco Chem. Co.</u>, 272 F.3d 13, 25 (1st Cir. 2001) (finding that decisionmaker's remark made some time in 1997 was "directly related and temporally proximate" to termination occurring in February 1998).[8]

Second, Acevedo contends that the company treated him differently from his younger replacement, Rivera, which constitutes evidence of age discrimination. Indeed, "[a]n employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus." <u>Vélez</u>, 585 F.3d at 451. However, "[t]o successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to him in all relevant respects were treated differently by the employer.'" <u>Kosereis</u> v. <u>Rhode Island</u>, 331 F.3d 207, 214 (1st Cir. 2003) (quoting <u>Conward</u> v. <u>Cambridge Sch. Comm.</u>, 171 F.3d 12, 20 (1st Cir. 1999)).

Because Rivera replaced Acevedo as Maintenance and Engineering Manager, it is clear that the two were similarly situated at the company. That is, it is undisputed that Rivera

---

[8]  We are by no means suggesting that these remarks, which also are susceptible to a benign interpretation, are, on their own, sufficient to sustain Acevedo's burden; but we do find that they may be considered in conjunction with other evidence, discussed herein, to determine if the aggregate proof satisfies the plaintiff's burden on summary judgment to raise an issue of fact regarding discriminatory motive. <u>Cf.</u> <u>Straughn</u> v. <u>Delta Air Lines, Inc.</u>, 250 F.3d 23, 36 (1st Cir. 2001) (holding that stray remarks may be considered evidence of bias only in combination with other evidence and if they were temporally close and causally related to the adverse employment decision).

came into the same responsibilities that Acevedo had prior to his termination. Despite this, Rivera was not reprimanded or disciplined for incidents that Acevedo contends were similar to the problems that arose during his tenure. For instance, in 2007, after Rivera took charge of the Maintenance and Engineering Department, an internal audit of the department revealed persistent violations of the company's SOPs and good manufacturing practices. These included departmental failures to follow procedures involving the purified water system, complete cleaning and sanitation adequately, and execute pest control procedures with the required frequency. A July 2007 unplanned deviation report also indicated that an increase in mold and yeast counts had been detected in the packaging area due to "improper area cleaning and sanitation," and unplanned deviation reports from 2008 reflected various instances in which pests, such as insects, a lizard, and rats, entered the plant. Despite admitting his knowledge of these events at the time they occurred, Ceinos did not hold Rivera accountable for them in her performance evaluations, nor were any other employees reprimanded for the same. We find that, based on this evidence, a jury could infer that the disparate treatment alleged by Acevedo existed, "exposing the pretextual nature of [Ex-Lax's] proffered explanation for firing [Acevedo] and revealing that [Ex-Lax's] true motivation was age discrimination." Vélez, 585 F.3d at 451.

-34-

The district court rejected Acevedo's disparate treatment argument because it found Rivera's infractions regarding the 2008 pest incidents were not comparable to Acevedo's. See Acevedo-Padilla, 740 F. Supp. 2d at 318.[9] Along the same lines, Ex-Lax argues that Rivera was not "similarly situated" to Acevedo because the problems under Rivera's governance that were reflected in the internal audit and unplanned deviation reports of 2007 and 2008 were distinguishable from the kinds of deficiencies Ceinos had previously held Acevedo accountable for. However, these are issues of fact and credibility, and Acevedo has presented sufficient evidence to allow a jury to decide whether the incidents were similar enough to support his allegation of disparate treatment. A reasonable factfinder could infer that the difference in Ceinos's treatment of Acevedo and Rivera, who was a much younger replacement, tends to prove the employer's discriminatory animus toward Acevedo. See, e.g., id. at 451-52 (where four employees, including the plaintiff, admitted to stealing property from the employer, but only the plaintiff was fired, a jury could

---

[9] For reasons that are not clear from its opinion, the district court did not refer to any of the evidence proffered by Acevedo supporting his allegations of Rivera's negligence beyond the 2008 pest incidents. Specifically, the district court failed to consider the 2007 and 2008 internal audit reports reflecting violations of Ex-Lax's SOPs during Rivera's tenure, or the 2007 unplanned deviation report indicating that mold and yeast had been detected in the packaging area while Rivera was manager. However, Acevedo's allegations are supported by the record and were properly briefed by the parties. Accordingly, we have considered them on de novo review.

"reasonably distrust" the employer's given reason for the firing and conclude that it was a pretext for age discrimination); see Mesnick, 950 F.2d at 824 ("deployment of younger replacements" may be considered as probative, circumstantial evidence of age discrimination (citing Hebert, 872 F.2d at 1115)).

Finally, we examine Acevedo's contention that a series of employment decisions made by Ex-Lax beginning in 2003 constitute an "invidious pattern of age-related discharges or forced early retirements" that hints at discriminatory animus on the part of Ex-Lax. Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990). Acevedo first points to the following statistics, gathered from Ex-Lax's employment records: (1) after Ceinos became Site Leader in 2003, the company hired approximately 140 employees, 114 of whom were younger than 40 years of age; (2) in the same period, 17 employees were fired, 15 of whom were over 40 years old. We have clarified that statistics, when considered in isolation and outside of context, are not probative of age discrimination. See, e.g., Cruz-Ramos v. P.R. Sun Oil Co., 202 F.3d 381, 385 (1st Cir. 2000) (noting that appellant's burden to show employer's discriminatory animus cannot be carried "simply by a comparison of ages within a sample that lacks statistical significance"). In this vein, Ex-Lax argues that Acevedo's reliance on the company's hiring data is unsound because, as the district court found, Acevedo "failed to provide information regarding the pool of

-36-

applicants or the composition of the relevant labor market." Acevedo-Padilla, 740 F. Supp. 2d at 318; see LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993) ("[T]he fact that recently hired [employees] are younger than [the plaintiff] is not necessarily evidence of discriminatory intent, but may simply reflect a younger available work force."). We cannot argue with this reasoning because our case law makes clear that Acevedo should have introduced evidence regarding the relevant labor market in order to put Ex-Lax's hiring data into context. Id. (failure to indicate "whether 'qualified older employees were available or applied for those jobs'" noted as "flaw[] in the statistical evidence" that recent hires were younger than the plaintiff for discriminatory reasons) (quoting Simpson v. Midland-Ross Corp., 823 F.2d 937, 943 (6th Cir. 1987)). Notwithstanding, it is relatively straightforward for one to draw statistical significance from the separately adduced fact that, after Ceinos's arrival in 2003, almost all of the fired employees -- 15 out of a total of 17 people -- were over forty years of age. A reasonable inference may be drawn from this evidence for the existence of the kind of pattern suggested by Acevedo.

In any event, this is not the only proof relied upon by Acevedo to substantiate his theory that his termination was part of a greater "pattern of age-related discharges or forced retirements." Medina-Muñoz, 896 F.2d at 10. In addition to the

-37-

reasonable inference that may be drawn from the documented firings that occurred at the plant soon after Ceinos's arrival, Acevedo offers the testimony of Rodríguez, who indicated that, upon beginning work as Site Leader in 2003, Ceinos instituted a new "recruitment plan" with the purpose of "substitut[ing] the persons who were of retirement age." As part of the recruitment plan, Rodríguez stated that Ceinos asked her to investigate how long employees at or nearing retirement age planned to stay at the company. She explained that although in effectuating this plan, HR did not pressure employees to retire, at least one employee at retirement age who was asked to retire early, and chose not to, was subsequently moved to another department and effectively demoted.

Ceinos, in contrast, averred that it was Rodríguez who brought to his attention a concern that there were a substantial number of employees in key positions that were near retirement age, and that this situation could result in a number of key positions being vacant simultaneously. As a result, Ceinos contends that he asked Rodríguez to prepare a plan to prevent this potential situation from coming to fruition. See Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 101 (1st Cir. 2002) (noting that "company officials are permitted to gather information relevant to personnel planning without raising the specter of age discrimination").

We acknowledge that "[an] offer of early retirement . . . is not, by itself, evidence of . . . discriminatory animus" and that "[s]omething more must be shown that would tie the decision to offer early retirement to discrimination." Álvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998). Notwithstanding, on a motion for summary judgment, we must draw all inferences in favor of the non-movant. See Hodgens, 144 F.3d at 156. A jury could find that the statistics, considered in conjunction with the recruitment plan about which Rodríguez testified -- and the rest of the plaintiff's circumstantial proof -- discredit Ceinos's stated reason for the discharge. See Hebert, 872 F.2d at 1114-15 (finding that plaintiff defeated summary judgment, after considering "admittedly weak" data proffered by plaintiff that beginning of supervisor's tenure coincided with dismissals of workers in protected class, where plaintiff's case for pretext did not rest on "general pattern data alone," and relied on other "suggestive scraps of circumstantial evidence").

## III. Conclusion

In sum, based on the totality of the record, we conclude that there was sufficient evidence presented on summary judgment from which a jury could draw the permissible inference that Ex-Lax's claimed reasons for terminating Acevedo were pretextual and that the decision was the result of discriminatory animus. We are particularly moved to this conclusion by inconsistencies between

Ex-Lax's stated reasons for dismissal and Acevedo's performance record at the company, the lack of credibility that may be ascribed by a jury to certain of Ceinos's justifications for dismissal, and, most importantly, the fact that in response to arguably similar conduct by Acevedo's younger replacement, Ex-Lax took no disciplinary action.

Because Acevedo's proffer on summary judgment is sufficient to raise a genuine issue of material fact as to whether discrimination motivated the adverse employment action -- a question that a jury, and not this court, should solve -- we must reverse the district court's determination in Ex-Lax's favor and remand.

**<u>Reversed and Remanded</u>**.