TORRUELLA, Circuit Judge.
Appellant Equal Employment Opportunity Commission (“EEOC”) asserts that Appellee Kohl’s Department Stores, Inc. (“Kohl’s”) refused to provide former employee Pamela Manning (“Manning”) with reasonable accommodations in violation of the Americans with Disabilities Act (“ADA”), 42 U.S.C. § 12112. The EEOC also asserts that by failing to comply with the ADA, Kohl’s constructively discharged Manning. The district court entered summary judgment in favor of Kohl’s on both claims. We affirm.
I. Background
The following undisputed facts are summarized in the light most favorable to the EEOC, the nonmoving party. See, e.g., McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir.2014). Manning suffers frofti type I diabetes. In October 2006, Manning was hired as a part-time sales associate at Kohl’s. She held this position until January 2008, when she was promoted to a full-time sales associate. As a full-time associate working thirty-six to forty hours per week, Manning worked predictable shifts which usually started no earlier than 9:00 a.m. and ended no later than 7:00 p.m. In January 2010, Kohl’s restructured its staffing system nationwide, resulting in a reduction in hours for Manning’s department. Manning maintained her full-time status because she performed work for various other departments depending on the store’s needs.
Due to the restructuring, Kohl’s scheduled Manning to work various shifts at different times during the day, and her scheduled hours became unpredictable as a result.[1] For example, Manning worked more “swing shifts” — a night shift followed by an early shift the next day. In March 2010, Manning informed her immediate supervisor, Michelle Barnes (“Barnes”), that working erratic shifts was aggravating her diabetes and endangering her health. Barnes told Manning to obtain a doctor’s note to support her accommodation request. Manning visited her endocrinologist, Dr. Irwin Brodsky (“Dr. Brodsky”), who determined that the stress Manning experienced due to working erratic hours deleteriously contributed to her high glucose levels. Dr. Brodsky wrote a letter to the store manager of Kohl’s, Trida Carr (“Carr”), requesting that Kohl’s schedule Manning to work “a predictable day shift (9a-5p or 10a-6p),” R. at 74, so that Manning could better manage her stress, glucose level, and insulin therapy.
Upon receiving Dr. Brodsky’s letter, Carr contacted Kohl’s human resources department seeking guidance in responding to Manning’s request. She emailed a copy of the letter to Michael Treichler (“Treichler”) in Human Resources and told him that Manning had submitted a written doctor’s “request[] that I accommodate [Manning] with day time hrs only.” Id. at 75. Treichler told Carr that with Manning *130 “being a full-time associate^] she would still need to be required to work nights and weekends and that definitely we would make sure she had no swing shifts, [and] that we would make sure ... that she really took her breaks.” Id. at 160 (Carr Dep.). Treichler asked Carr to meet with Manning and propose the no-swing-shift option. Carr’s deposition testimony describing this sequence of events is consistent with an email she received from Treichler responding to her request for guidance, which, stated, in part: “Clearly we can not have [Manning] not work nights. BUT, we can work with her to avoid the ‘swing shifts’ — A [sic] close followed by an open.” Id. at 76.
Subsequently, Carr and Barnes arranged to meet with Manning on March 31, 2010, to discuss Manning’s concerns. During their meeting, Manning requested “a steady schedule, [but] not specifically 9:00 to 5:00.” Id. at 282 (Manning Dep.). As she described it, “I was asking for a midday shift, what I had before, the hours that I had before [the departmental restructuring].” Id. at 281 (Manning Dep.). Manning also expressed a willingness to work on weekends.
Carr responded that she had spoken to “higher-ups” at the corporate management level, and that she could not provide a consistently steady nine-to-five schedule.[2] Manning became upset, told Carr that she had no choice but to quit because she would go into ketoacidosis[3] or a coma if she continued working unpredictable *131 hours, put her store keys on the table, walked out of Carr’s office, and slammed the door. Concerned, Carr followed Manning into the break room outside, asking what she could do to help. During this conversation, Carr attempted to calm Manning down and requested that she reconsider her resignation and discuss other potential accommodations. Manning responded, “Well, you just told me Corporate wouldn’t do anything for me.” Id. at 458-59 (Manning Medical Examination). Manning did not discuss any alternative accommodations with Carr, but instead cleaned out her locker and left the building. A few days later, on April 2, 2010, Manning contacted the EEOC, seeking to file a discrimination claim.
On April 9, 2010, Carr called Manning to request that she rethink her resignation and consider alternative accommodations for both part-time and full-time work. Manning asked Carr about her schedule, and Carr informed her that she would need to consult with the corporate office about any accommodations. After this phone call, Manning had no further contact with anyone at Kohl’s. Because it had not heard from Manning, Kohl’s treated her departure as voluntary and terminated her employment later that month.
The EEOC brought this current suit on Manning’s behalf in the United States District Court for the District of Maine in August 2011. The district court entered summary judgment in favor of Kohl’s, concluding on the ADA claim that Manning had failed to engage in an interactive process in good faith and on the constructive discharge claim that a reasonable person in Manning’s position would not have felt compelled to resign.
II. Discussion
The EEOC appeals the district court’s grant of summary judgment in favor of Kohl’s on both the ADA discrimination claim and the constructive discharge claim. We review a district court’s grant of summary judgment de novo. E.g., Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 136 (1st Cir.2012). We draw “ ‘all reasonable inferences in favor of the nonmoving party,’ ” id. (quoting Sánchez-Rodríguez v. AT & T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir.2012)), “‘without deference to ... the district court,’ ” id. (quoting Hughes v. Bos. Mut. Life Ins. Co., 26 F.3d 264, 268 (1st Cir.1994)).
Summary judgment is appropriate if the moving party demonstrates that there is “no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a); accord Acevedo-Parrilla, 696 F.3d at 136. There is no genuine dispute of material fact when the moving party demonstrates that the opposing party has failed “to máke a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial.” Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We now examine each of the EEOC’s claims, in turn.
A. The ADA Discrimination Claim
To establish a case of disability discrimination under the ADA, the EEOC must establish that: “ ‘(1) [Manning] is disabled within the meaning of the ADA, (2) [Manning] was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [Kohl’s], despite knowing of [Manning]’s disability, did not reasonably accommodate it.’ ” Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir.2007) (quoting Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir.2003)). The EEOC’s failure to satisfy any one of these elements *132 warrants the entry of summary judgment against it as a matter of law. See Celotex Corp., 477 U.S. at 322-23, 106 S.Ct. 2548. We bypass any discussion about the first two elements and proceed directly to the third element, the basis for our affir-mance.[4]
Under the third element, an employee’s request for accommodation sometimes [5] creates “a duty on the part of the employer to engage in an interactive process.” See Enica v. Principi, 544 F.3d 328, 338 (1st Cir.2008). The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues. See 29 C.F.R. § 1630.2(o )(3). It requires bilateral cooperation and communication. See Enica, 544 F.3d at 339.
We must emphasize that it 'is imperative that both the employer and the employee have a duty to engage in good faith, and that empty gestures on the part of the employer will not satisfy the good faith standard. If an employer engages in an interactive process with the employee, in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations. See, e.g., id. (“[T]he process requires open communication by both parties, and an employer will not be held liable if it makes ‘reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed....’” (last alteration in original) (quoting Phelps v. Optima Health, Inc., 251 F.3d 21, 28 (1st Cir.2001))); Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 736 (5th Cir.1999) (“[A]n employer cannot be found to have violated the ADA when responsibility for the breakdown of the ‘informal, interactive process’ is traceable to the employee and not the employer.” (quoting Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.1996))).
Here, the record shows that after Manning left the meeting on March 31, 2010, Carr pursued her, attempted to calm her down, asked her to reconsider her resignation, and requested that she contemplate alternative accommodations. Manning refused, instead confirming that she quit by cleaning out her locker and departing the building. Ten days later, Carr called Manning, repeating her request for Manning to reconsider her resignation and to contemplate alternative accommodations. Manning never responded to Carr.[6] Approximately one week after *133 this phone call, Kohl’s terminated Manning’s employment.
While Kohl’s response to Manning’s accommodation request may well have been ham-handed, based on the undisputed facts, we cannot find that its subsequent overtures should be construed as empty gestures.[7] The refusal to give Manning’s specific requested accommodation does not necessarily amount to bad faith, so long as the employer makes an earnest attempt to discuss other potential reasonable accommodations. Here, Kohl’s refused to provide Manning’s preferred schedule, but was willing to discuss other schedules that would balance Manning’s needs with those of the store. Manning refused to hear what Kohl’s had to offer. “ ‘It is difficult to judge the reasonableness of accommodations when the employee withdraws before we can say with any authority what these accommodations would have been.’ ” Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 225 (5th Cir.2011) (quoting Loulseged, 178 F.3d at 734). Manning’s refusal to participate in the interactive process is the reason why the record lacks facts regarding what reasonable accommodations Kohl’s might have offered had Manning cooperated. We conclude that Kohl’s acted in good faith when it initiated an interactive process and displayed its willingness to cooperate with Manning, not once but twice, to no effect. See, e.g., Phelps, 251 F.3d at 28.
Furthermore, we conclude that Manning’s refusal to participate in further discussions with Kohl’s was not a good-faith effort to participate in an interactive process. See, e.g., Enica, 544 F.3d at 339 (quoting Beck, 75 F.3d at 1135); Phelps, 251 F.3d at 28. Indeed, because Manning chose not to follow up with Carr’s offer to discuss alternative accommodations, Manning was primarily responsible for the breakdown in the interactive process.[8] See Phelps, 251 F.3d at 27 (holding plaintiff responsible for the breakdown in the interactive process when she “failed to cooperate in such a process”); see also Griffin, 661 F.3d at 225 (quoting Loulseged, 178 F.3d at 734).
In sum, when an employer initiates an interactive dialogue in good faith with *134 an employee for the purpose of discussing potential reasonable accommodations for the employee’s disability, the employee must engage in a good-faith effort to work out potential solutions with the employer prior to seeking judicial redress. Manning did not do so in this case, and therefore, the EEOC has failed “to make a showing sufficient to establish the existence of an element essential to [its] case.... ” See Celotex Corp., 477 U.S. at 322, 106 S.Ct. 2548. Accordingly, we hold that summary judgment against the EEOC on the ADA discrimination claim is warranted as a matter of law.[9]
B. The Constructive Discharge Claim
To establish a claim of constructive discharge, the EEOC must show that Manning’s working conditions were “so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign.” Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir.2000) (citing Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir.1993)). In other words, work conditions must have been so intolerable that Manning’s decision to resign was “void of choice or free will” — that her only option was to quit. See Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir.2008). This standard is entirely objective — we do not put weight on the employee’s subjective beliefs, “ ‘no matter how sincerely held.’ ” Id. at 52 (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir.2002)).
Here, the EEOC fails to meet this objective “reasonable person” standard. The EEOC argues that Manning’s fears that she would go into ketoacidosis or slip into a coma were objectively reasonable because her doctor told her that continuing to work erratic shifts could cause these serious medical complications. Even assuming, arguendo, that being concerned about these health issues is objectively reasonable, we still find that Manning’s choice to resign was “grossly premature, as it was based entirely on [her] own worst-case-scenario assumption” that Kohl’s would not provide her with accommodations. See id. According to the record, after Manning left the meeting in Carr’s office on March 31, 2010, Carr followed Manning into the break room. Carr gave Manning her first opportunity to reconsider her resignation and offered to discuss other potential accommodations with Manning. Manning ignored this first overture, despite seeing that Carr was willing to discuss and negotiate alternative accommodations. On April 9, 2010, Carr called Manning over the phone, repeating her request that Manning reconsider both her resignation and her refusal to discuss alternative accommodations. Manning also ignored this second overture.
“[A]n employee is obliged not to assume the worst, and not to jump to conclusions too [quickly].” Id. (internal quotation marks omitted). Here, Manning not only jumped to a conclusion prematurely, but she also actively disregarded two opportunities to resolve her issues. We agree with the Seventh Circuit that a reasonable person would simply not feel “compelled to resign” when her employer offered to discuss other work arrangements with her. See EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 441 (7th Cir.2000) (“Instead of discussing the new work schedule^] ... [the employee] resigned. While this was certainly her prerogative, we do not believe this was her only option.... [W]e cannot conclude that a reasonable person in her position would have beep compelled *135 to resign.”); see also Torrech-Hernández, 519 F.3d at 50-51. Because we find that a reasonable person in Manning’s position would not have concluded that departing from her job was her only available choice, the EEOC has failed to meet the “reasonable person” element for a constructive discharge claim. We consequently hold that summary judgment against the EEOC on the constructive discharge claim is warranted as a matter of law.
III. Conclusion
We are sympathetic to Manning’s medical issues. Moreover, we note that had the matter ended at the refusal by Kohl’s to grant Manning’s request for a steady work schedule, Manning might well have had viable causes of action. Yet, for both of her claims, we cannot ignore the multiple subsequent opportunities that Kohl’s offered to Manning to discuss alternative reasonable accommodations. Consequently, the facts, even when read in the EEOC’s favor, substantiate neither a claim for ADA discrimination nor a claim for constructive discharge. It follows that the district court correctly granted summary judgment in favor of Kohl’s on both claims.

AFFIRMED.

. Numerous Kohl’s employees testified throughout discovery that full-time associates were expected and required to have "open availability,” meaning they could be scheduled to work at any time of the day or night. See R. at 92, 95 (Barnes Dep.); id. at 178 (Gamache Dep.); id. at 370-71, 399-401 (Treichler Dep.); id. at 445 (St. John Dep.); id. at 453 (Wilner Dep.). Full-time associates were also required to work two night or evening shifts each week, and every other weekend as well. See, e.g., id. at 370 (Treichler Dep.).

. This is where the dissent parts ways with our view of the record. The dissent states that Carr failed to offer Manning any alternative accommodation at the March 31 meeting, even though she had been expressly authorized to offer Manning a schedule with no swing shifts. The dissent views Carr's failure to bring up the swing shifts as evidence that would allow a jury to find that Kohl's was not making a good faith effort to engage with Manning. We disagree. While a reasonable jury could have found that Carr was authorized to offer "no swing shifts," and that she did not volunteer this information at her meeting with Manning, we are unable to ascribe the same significance to these facts as does the dissent.
Manning’s requested accommodation was, as stated by Dr. Brodsky, "a predictable day shift.” Indeed, at his deposition Dr. Brodsky agreed that in his letter to Kohl’s he "asked that Ms. Manning be allowed to work a predictable work shift either nine to five or ten to five." He further testified that the “only situation ... about which [he] rendered an opinion is the one that [he] listed in the letter,” and he agreed that "any variations beyond the nine a.m. to five p.m. or the [ten] a.m. to six p.m. [schedule] would require [him] to have a further discussion with Ms. Manning[.]” Manning herself said that she requested "a steady schedule, not specifically 9:00 to 5:00.” No one is in a better position than Manning and her doctor to tell us what Manning’s requested accommodation actually was, and the evidence on this point is uncontested. Manning was not simply asking for “no swing shifts,” she was in fact looking to be relieved of the obligation to work night shifts as well.
The uncontested evidence in the record also demonstrates that Carr was never authorized to grant Manning’s request. Indeed, the only evidence is that for Manning to continue working as a full-time associate, Kohl’s would continue® to require Manning to work nights. Thus, there is no evidence that Carr refused to extend a requested reasonable accommodation that she had been authorized to give. This is not a case in which an employer privately decides that it would grant a requested accommodation, but then elects not to offer it as part of strong-arm negotiating tactics in the hopes that the employee would accept something less than he or she originally requested.
Given the state of this record, we are unable to agree with the dissent’s view of Kohl’s negotiating tactics. We do not believe a reasonable jury could find that Kohl’s failed to negotiate in good faith based on Carr's authorization to offer "no swing shifts.”

. Diabetic ketoacidosis is a serious medical complication that is caused by low insulin levels. In response, the body burns fatty acids, causing potentially dangerous levels of acidity to build up in the bloodstream.

. The district court considered but rejected the argument by Kohl’s that Manning was not qualified to perform the "essential functions" of her job (element (2)). Instead, the district court granted summary judgment to Kohl’s under the accommodation issue (element (3)) because it found that Manning failed to engage in the interactive process in good faith. We proceed directly to the interactive process analysis because "[w]e may uphold an entry of summary judgement on any basis apparent from the record.” McGrath, 757 F.3d at 25.

. This court does not regard an employer's participation in the interactive process as an absolute requirement under the ADA. Instead, we have held that we "resolve the issue on a case-by-case basis.” Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir.2001). In this case, we do not need to address whether Kohl's had a duty to engage in an interactive process, since it did in fact initiate such a dialogue with Manning.

.The record indicates that a member of the EEOC’s staff may have told Manning not to continue to participate in the interactive process following her precipitous departure from Kohl’s. During her medical examination, when asked about Carr's April 9, 2010, phone *133 call to Manning, requesting that she reconsider her resignation, this was her response:
MS. MANNING: ... I just wanted to get off the phone as fast as I could. And then I called—
DR. BOURNE: You could not talk?
MS. MANNING: No. And I told her that I couldn't talk.
DR. BOURNE: Per EEOC’s directions?
MS. MANNING: Yes.
R. at 461-62 (Manning Medical Examination).
Assuming this is what happened, Manning should have been directed to do precisely the opposite: she should have been informed that she was obliged to continue to engage with the interactive process in good faith. It thus may well be that Manning’s current predicament is due to erroneous advice provided by the EEOC. Such a fact, if true, would be troubling, given the EEOC’s duty to investigate discrimination claims and authorize lawsuits. One would expect that the EEOC should know that an employee’s failure to cooperate in an interactive process would doom her ADA claim.

. The EEOC suggests that Kohl's did not act in good faith because Carr’s attempts to reconcile with Manning were disingenuous "empty gestures.” As discussed below, the record does not support this assertion.

. The EEOC cites to Colwell v. Rite Aid Corp., 602 F.3d 495 (3d Cir.2010) in support of its claim that the refusal by Kohl's to accommodate Manning's requests constituted a termination of the interactive process. We find Colwell distinguishable, because in that case, the evidence indicated that the employer may have been more responsible for a failure to communicate. See id. at 507-08. Here, Kohl’s attempted to communicate with Manning twice, to no effect.

. We must emphasize that our holding is limited to the highly idiosyncratic facts of this case and should not be interpreted as upsetting our current ADA jurisprudence.