MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2016 ME 107
Docket:      Cum-15-60
Argued:      December 10, 2015
Decided:     July 12, 2016

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

## DANIELLE SULLIVAN

v.

## ST. JOSEPH'S REHABILITATION AND RESIDENCE et al.

SAUFLEY, C.J.

[¶1]  In 2012, Danielle Sullivan resigned from her job as director of nursing at St. Joseph's Rehabilitation and Residence, and in 2013, she filed a two-count complaint against St. Joseph's[1] seeking relief pursuant to the Whistleblowers' Protection Act, 26 M.R.S. §§ 831-840 (2015).  One count of the complaint asserted a specific claim for relief based on an allegation of constructive discharge.  The court (Cumberland County, *Cole, C.J.*) granted a summary judgment for St. Joseph's on Sullivan's constructive discharge claim, and a jury trial was then held

---

[1]  Sullivan's initial complaint was filed against "Catholic Health East, dba St. Joseph's Rehabilitation and Residence."  She filed an amended complaint against "Catholic Health East and St. Joseph's Rehabilitation and Residence."  The court (Cumberland County, *Cole, C.J.*) granted a summary judgment for CHE and dismissed CHE from the case, finding that Sullivan failed to raise a genuine dispute of material fact as to whether there was an employment relationship between her and CHE, *see Brown v. Bank of America, N.A.*, 5 F. Supp. 3d 121, 129-30 (D. Me. 2014), and also that Sullivan had failed to name CHE in her original complaint to the Maine Human Rights Commission pursuant to 5 M.R.S. § 4622 (2015).  We are not persuaded by Sullivan's arguments that the court erred in granting summary judgment and dismissing CHE as a party, and do not address the issues further in this opinion.

2

on Sullivan's remaining WPA claim.[2]  The jury found against Sullivan on that claim.  Sullivan now appeals from the court's entry of a summary judgment in favor of St. Joseph's on the constructive discharge claim.  We affirm the judgment.

## I. BACKGROUND

[¶2]  Sullivan's complaint included two counts asserted pursuant to the WPA—"retaliation" and "constructive discharge."  St. Joseph's moved for summary judgment on both counts and prevailed as to the constructive discharge claim.  Because Sullivan appeals only from the court's grant of summary judgment, the following facts are drawn from the summary judgment record.[3]  *See* *Budge v. Town of Millinocket*, 2012 ME 122, ¶ 12, 55 A.3d 484.  Recognizing that these facts may have been disputed in the context of the constructive discharge count had it gone to trial, we are nonetheless bound to consider the facts drawn from the summary judgment record in the light most favorable to Sullivan.  *Id.*

---

[2]  The Maine Human Rights Act prohibits discrimination in violation of the Whistleblowers' Protection Act, and provides employees with an avenue through which to obtain damages as a result of retaliation under the WPA.  *See* 5 M.R.S. §§ 4551-4634 (2015); 5 M.R.S. § 4572(1), (1)(A) ("It is unlawful employment discrimination, in violation of this Act . . . [f]or any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment . . . because of previous actions taken by the applicant that are protected under [the WPA].").

[3]  St. Joseph's argues primarily that because a jury eventually found in a special verdict form that Sullivan had suffered no "adverse employment action" at the hands of St. Joseph's, she is now foreclosed from appealing the grant of summary judgment on the constructive discharge count.  Because we affirm the court's grant of summary judgment on the basis that the court did not err in finding that no genuine dispute of material fact exists as to whether Sullivan was constructively discharged, we do not address St. Joseph's argument regarding the consequences of the jury verdict on this appeal.

[¶3]  In December 2009, St. Joseph's Rehabilitation and Residence, a Maine nonprofit corporation, hired Danielle Sullivan as director of nursing.  In November 2010, Sullivan and others at St. Joseph's were asked to reduce staff to cut expenses.  Sullivan was concerned that the cost-cutting measures would affect the health of the residents, resulting in negative outcomes or potential negative outcomes for the residents.  Sullivan complained about the cost-cutting measures to her superiors.  She also emailed the chair of the Board of Directors.  Afterwards, she complained to the human resources department because she felt like her job had been "almost threatened."

[¶4]  Beginning in September or October 2011, Sullivan raised concerns on multiple occasions about admissions.  She complained about the admission of certain patients who had needs she felt St. Joseph's could not meet and about the admission process in general, including her perception that St. Joseph's was, on occasion, admitting patients without the requisite paperwork and/or background information.

[¶5]  In February 2012, a new clinical consultant was assigned to conduct an audit and prepare a marketing plan for St. Joseph's.  In February or March 2012, a new admissions director was appointed.  Sullivan believed that admissions problems continued after the new director was hired.  The director sometimes sent

Sullivan emails telling her how to do her job. Sullivan complained about the emails. Sullivan also complained that the director engaged in bullying behavior.

[¶6] In April 2012, the clinical consultant began to work on site at St. Joseph's. Also in April, a new administrator joined St. Joseph's. The new administrator and the clinical consultant worked together on a "master plan," which was completed in early May. The purpose of the master plan was to increase revenue through increasing the number of residents. Sullivan felt that she was being alienated, as her concerns were not being addressed. The clinical consultant and the admissions director were excessively critical of Sullivan's skills and job performance, and communicated criticisms in a harsh and rude manner. Sullivan complained to the administrator about the clinical consultant's behavior.

[¶7] The administrator, the clinical consultant, and the admissions director excluded Sullivan from two or three meetings and from decision-making processes. In May, Sullivan's admissions responsibilities were moved to the administrator. The clinical consultant and the administrator arranged a meeting with Sullivan and accused Sullivan of being "not on board with the changes" at St. Joseph's. Sullivan felt uncomfortable working at St. Joseph's in May 2012.

[¶8] On Friday, May 18, 2012, Sullivan told the administrator that she wanted to resign. Her desire to resign was motivated in part by the admissions

process, her exclusion from meetings, and unwarranted criticism from the others. The administrator encouraged Sullivan not to resign.

[¶9]  On May 21, the clinical consultant's superior met with Sullivan and presented her with a thirty-day performance plan.  The plan, which addressed eight areas in which he and the clinical consultant believed Sullivan needed to improve her job performance, was issued to Sullivan in writing on May 22.  The performance plan informed Sullivan that she could be terminated if progress in those areas was not achieved within thirty days.  Sullivan believed that the performance plan was a form of retaliation for expressing her formal complaints and concerns because she felt nothing in the plan was warranted or accurate. Sullivan had issued similar notices to employees that she supervised, however, and she did not consider those notices to be a form of retaliation.

[¶10]  Sullivan complained to the administrator about the plan.  Sullivan felt that she was going to be terminated and felt compelled to resign.  Sullivan tendered her resignation on May 23, 2012, one day into the thirty-day performance plan, to be effective in thirty days.  A few days later, the clinical consultant told Sullivan that she was no longer authorized to make certain management-level decisions about nursing staff and told the administrator that he should escort Sullivan from the building.

6

[¶11] At no time during her employment at St. Joseph's was Sullivan's pay reduced, nor was she ever demoted, transferred, or discharged from her employment. She received regular pay increases and worked full time until she resigned.

[¶12] On the basis of those allegations, the court denied the motion for summary judgment on the retaliation claim and granted a summary judgment on the separate count alleging constructive discharge.

## II. WHISTLEBLOWERS' PROTECTION ACT AND CONSTRUCTIVE DISCHARGE[4]

[¶13] The Whistleblowers' Protection Act prohibits employers from retaliating against employees who report or refuse to commit certain acts, including acts that employees believe to be illegal or unsafe. 26 M.R.S. § 833(1). Specifically, the WPA states that employers may not "discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment" because of an employee's engagement in the specified acts. *Id*.

[¶14] To establish a prima facie case of a violation of the WPA, an employee must provide evidence of the three components of the claim. She must show that (1) she "engaged in activity protected by the statute," (2) she "was the

---

[4] Although the MHRA and WPA are Maine statutes, "[o]ur construction of the MHRA and WPA has been guided by federal law." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 13, 915 A.2d 400.

subject of adverse employment action," and (3) "there was a causal link between the protected activity and the adverse employment action." *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (1991). An adverse employment action is an action that materially changes the conditions of an employee's employment. *Higgins v. TJX Cos., Inc.*, 331 F. Supp. 2d 3, 6-7 (D. Me. 2004).

[¶15] Because a discharge or termination from employment materially changes the conditions of employment, a plaintiff may satisfy the element of "adverse employment action" by proving that she was discharged from her employment. *See* 26 M.R.S. § 833(1). Pertinent here, that element may be proved when the employee is not actually discharged but is "constructively" discharged. *Levesque v. Androscoggin Cty.,* 2012 ME 114, ¶ 8, 56 A.3d 1227. Constructive discharge may be found when, due to the actions of the employer, an employee's "working conditions were so difficult or unpleasant that a reasonable person in [the employee's] shoes would have felt compelled to resign." *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir. 2003) (quotation marks omitted).

[¶16] Constructive discharge is not, however, a freestanding claim under the Whistleblower's Protection Act. *Levesque*, 2012 ME 114, ¶ 6, 56 A.3d 1227. To effectively claim a violation of the WPA based on a constructive discharge, an employee must establish all three elements of a WPA claim: protected activity,

8

adverse employment action—in the form of "constructive" rather than actual discharge, which requires proof of two elements—and a causal connection between the two. *See Bard*, 590 A.2d at 154; *Levesque,* 2012 ME 114, ¶ 8, 56 A.3d 1227.

[¶17] Specifically, when an employee who has resigned claims that an adverse employment action occurred in the form of a constructive discharge, the employee has the additional burden of proving the constructive discharge. *See Landrau-Romero v. Banco-Popular de Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000) ("Alleging constructive discharge presents a 'special wrinkle' that amounts to an additional prima facie element."); *Bodman v. Me. Dep't of Health & Human Servs.*, 720 F. Supp. 2d 115, 123 (D. Me. 2010) (characterizing constructive discharge as a "compound" claim). To do so, the employee must prove that (1) the employer engaged in unlawful retaliatory conduct that created working conditions so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (2) that the unlawful retaliatory conduct in fact caused the employee's resignation. *See Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004) ("A constructive discharge involves both an employee's decision to leave *and* precipitating conduct . . . .") (emphasis added); *cf. Landrau-Romero*, 212 F.3d at 613.

[¶18] When proved along with the other elements of a WPA claim, a constructive discharge claim will allow the "discharged" employee the possibility

of an award of damages as if she had, in fact, been discharged in violation of the WPA, such as back pay. *See Levesque*, 2012 ME 114, ¶ 8, 56 A.3d 1227. Specifically, as with employees who were actually fired from their jobs, "[a] plaintiff who is successful in proving constructive discharge may be entitled to recover two sets of damages: damages flowing from the [unlawful retaliatory conduct] (i.e., compensatory damages and possibly punitive damages) as well as damages flowing from the loss of her job (most notably back pay and front pay)." *Bodman*, 720 F. Supp. 2d at 123.

[¶19]  Because a claim of constructive discharge is a compound claim that must necessarily stand or fall with some form of unlawful discrimination, *see Levesque*, 2012 ME 114, ¶ 11, 56 A.3d 1227, constructive discharge arising from retaliatory conduct on behalf of an employer need not be pleaded in a separate count from a claim of unlawful retaliation.  Instead, the components of the constructive discharge claim may be alleged in the same count.  This is true even though proving constructive discharge can provide a basis for additional damages. It is with these principles in mind that we analyze the case at hand.

### III.  GRANT OF SUMMARY JUDGMENT

[¶20]  "A defendant who moves for summary judgment is entitled to a judgment as a matter of law if the plaintiff fails to establish a prima facie case for

each element of her cause of action."[5]  *Levesque*, 2012 ME 114, ¶ 5, 56 A.3d 1227 (quotation marks omitted).  We agree with the court's conclusion that based on the undisputed facts, Sullivan did not make out a prima facie case that she had been constructively discharged.

[¶21]  As noted, to prevail on an allegation of constructive discharge, the employee must prove that, due to the actions of the employer, an employee's "working conditions were so difficult or unpleasant that a reasonable person in [the employee's] shoes would have felt compelled to resign."  *Lee-Crespo*, 354 F.3d at 45 (quotation marks omitted).  This is an objective standard, and "an employee's subjective perceptions do not govern."  *Id.*  It is not enough that an employee suffered "the ordinary slings and arrows that workers routinely encounter in a hard, cold world."  *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000).  In order for a resignation to constitute a constructive discharge, it must be "void of choice or free will—[the] only option was to quit."  *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) (quotation marks omitted).  "[A]n employee is obliged not to assume the worst, and not to jump to conclusions too fast."  *Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 52 (1st Cir. 2008) (quotation

---

[5]  To survive a motion for summary judgment, an employee is required only to produce evidence to support a prima facie case of WPA retaliation; we have previously determined that at this stage of the proceedings, it is unnecessary to shift the burden of production pursuant to the second and third steps of the *McDonnell Douglas* analysis.  *See Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 13, 126 A.3d 1145; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803-04 (1973).

marks omitted). Thus, absent exceptional and objectively unbearable circumstances, a corrective performance plan does not present an opportunity to resign and label that resignation a "constructive discharge."

[¶22] Here, Sullivan resigned only one day after the written thirty-day performance plan was issued to her. Sullivan did present evidence to show that due to her complaints regarding St. Joseph's procedures that she felt were illegal and/or unsafe, her supervisors alienated her, criticized her, and issued a negative performance review with a thirty-day performance plan. Accepting Sullivan's representations as true, the workplace may have been a difficult environment for her. The facts alleged, however, do not rise to the level where her only option was to quit. Put another way, the evidence contained in the summary judgment record would not allow a jury to reasonably conclude that the working conditions were so difficult or unpleasant that a reasonable person in Sullivan's shoes would have felt *compelled* to resign.

## IV. CONCLUSION

[¶23] The court did not err in addressing the constructive discharge claim separately on the motion for summary judgment, and Sullivan did not raise a genuine dispute of material fact as to whether, due to St. Joseph's actions, her working conditions were so difficult and objectively unbearable that a reasonable person in her shoes would have felt compelled to resign.

The entry is:

Judgment affirmed.

_____

**On the briefs:**

Guy D. Loranger, Esq., Law Office of Guy D. Loranger, P.A., Old Orchard Beach, for appellant Danielle Sullivan

James B. Haddow, Esq., Gerald F. Petruccelli, Esq., and Kimberly A. Watson, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellee St. Joseph's Rehabilitation and Residence

Katharine I. Rand, Esq., and Nolan L. Reichl, Esq., Pierce Atwood, Portland, for appellee Catholic Health East, Inc.

**At oral argument:**

Guy D. Loranger, Esq., for appellant Danielle Sullivan

Gerald F. Petruccelli, Esq., for appellee St. Joseph's Rehabilitation and Residence

Nolan L. Reichl, Esq., for appellee Catholic Health East, Inc.