STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-17-46

ELIZABETH HUDSON,

        Plaintiff

v.

        ORDER ON DEFENDANT'S
        MOTION FOR
        SUMMARY JUDGMENT

STATE OF MAINE
COMMISSION ON
GOVERNMENTAL ETHICS
AND ELECTION PRACTICES,

        Defendant

Before the Court is Defendant State of Maine Commission on Governmental Ethics and Election Practices' Motion for Summary Judgment.[1] Plaintiff Elizabeth Hudson represents herself, pro se.[2] The Commission is represented by the Office of the Attorney General.

I.    Background

Ms. Hudson was employed by the Maine Commission on Governmental Ethics and Election Practices (the "Commission") from December 9, 2013 through January 20, 2015. (Supp.'g S.M.F. ¶ 1.) The Commission is a state agency that administers

---

[1] Argument on the Commission's Motion for Summary Judgment was originally held on August 7, 2018 before a different justice. During that oral argument, the justice recognized a potential conflict and recused herself from the case. The undersigned justice was assigned to this matter and oral argument on the motion was held on September 7, 2018.
[2] Attorneys David Webbert and Max Katler represented Plaintiff for the sole purpose of filing the Complaint. Plaintiff has represented herself in defending against the current Motion for Summary Judgment.

1

Maine's campaign finance laws, lobbyist disclosure laws and advises legislators on issues of official conduct. (Supp.'g S.M.F. ¶ 2.) Ms. Hudson's job performance was satisfactory at all times relevant to this case. (Supp.'g S.M.F. ¶ 3.) John Wayne is the Executive Director of the Commission and Paul Lavin is the Assistant Director. (Supp.'g S.M.F. ¶ 4.) In addition to the Director and Assistant Director, the Commission has four full-time employees who all share the same office space. (Supp.'g S.M.F. ¶ 6.)

On November 14, 2014, the Commission issued a new fragrance policy (the "Policy") that did not permit employees to wear scented or fragranced products in the office. (Supp.'g S.M.F. ¶ 5.) It was distributed by email. (Supp.'g S.M.F. ¶ 11.) The Commission contends that the purpose of the no-fragrance policy was to ensure that all Commission employees could work comfortably in the office. (Supp.'g S.M.F. ¶ 7.) Prior to enacting the Policy, the Commission knew that two employees, Cynthia Phillips and Paul Lavin, had expressed difficulty with scented products in the workplace. (Supp.'g S.M.F. ¶ 8.) Ms. Phillips testified at Ms. Hudson's unemployment benefits hearing that she was bothered by Ms. Hudson's use of fragrance in 2014 at least once per week and that she expressed her discomfort to Ms. Hudson on one occasion. (Supp.'g S.M.F. ¶ 9.) Ms. Hudson contends that the Policy was created in response to Ms. Phillip's complaints that she was sensitive to Ms. Hudson's smell. (Opp. S.M.F. ¶ 7.) Ms. Hudson argues that there has been no evidence presented of any medical conditions that would cause Ms. Phillips or Mr. Lavin's sensitivity to scented products. (Opp. S.M.F. ¶ 8.)

After distribution of the Policy, the Commission's managers met with each employee to explain the policy and to address any concerns. (Supp.'g S.M.F. ¶ 12.) After the Policy was announced Ms. Hudson told Mr. Wayne and Mr. Lavin that she had a skin condition that she treated with non-prescription lotions that had a fragrance, and that made her unable to comply with the Policy. (Supp.'g S.M.F. ¶

2

14.) By email dated November 16, 2014, Ms. Hudson told Mr. Wayne and Mr. Lavin that she would do her best to work with her doctor to find a solution that would allow her to comply with the Policy and stated that she volunteered to work from home until she could find treatment lotions that were policy-compliant. (Supp.'g S.M.F. ¶¶ 15, 17.)

The Commission's managers consulted with the Director of Human Resources assigned to the Commission, Patricia Beaudoin, on November 17, 2014. (Supp.'g S.M.F. ¶ 19.) After discussing the matter with Laurel Shippee, the State EEO Officer, both Ms. Beaudoin and Ms. Shippee advised Mr. Wayne and Mr. Lavin not to discuss with Ms. Hudson her medical condition or her specific skin products. (Supp.'g S.M.F. ¶ 21.)

Over five work weeks following Ms. Hudson's November 16 email, Mr. Wayne and Mr. Lavin on occasion percieved that Ms. Hudson was using scented products in the workplace but presumed that she was still looking into unscented products. (Supp.'g S.M.F. ¶ 23.) Mr. Wayne and Mr. Lavin contend that they were waiting for Ms. Hudson to either find a treatment that complied with the Policy, or to make a reasonable accommodation request pursuant to the Americans with Disabilities Act ("ADA"). (Supp.'g S.M.F. ¶ 24.) Ms. Hudson contends that she made reasonable accommodation requests to the Commission's managers via email on November 16, 2014, via email to Mr. Wayne and Mr. Lavin on November 19, 2014, in her meeting with Ms. Shippee and Ms. Beaudoin on November 21, 2014, via email to Ms. Beaudoin on November 25, 2014, and via email to Ms. Beaudoin on November 26, 2014. (Opp. S.M.F. ¶ 24.)

Between November 17 and November 20, 2014, Ms. Hudson was out of the office voluntarily and met with both her general physician, Dr. Gasper, and a dermatologist, Dr. Karnes. (Supp.'g S.M.F. ¶¶ 25, 27, 28.) Dr. Karnes recommended at least four products that could be used as treatment for her dry skin, eczema, and

3

dermatographia. (Supp.'g S.M.F. ¶¶ 28, 29.) The following day, November 21, 2014, Ms. Hudson met with Ms. Shippee and Ms. Beaudoin. (Supp.'g S.M.F. ¶ 31.) The Commission attests that Ms. Shippee and Ms. Beaudoin encouraged Ms. Hudson to make a request for reasonable accommodation pursuant to the ADA. (Supp.'g S.M.F. ¶ 31.) Ms. Hudson states that Ms. Shippee provided misinformation by telling Ms. Hudson that if she were to ask for a reasonable accommodation Ms. Hudson may be asked to stay in her office with the door shut, to use a separate entrance and path to her office, not to use one of the conference rooms, she may be relocated, she may be reassigned to a new position, or she may be let go. (Opp. S.M.F. ¶ 31.)

Ms. Hudson contends that she brought a list of questions to her meeting with Ms. Shippee and Ms. Beaudoin which included "Will I be able to treat my condition with the products I have been using that have been effective in controlling the symptoms without fear of reprisal?"; "What accommodations will be made to ensure I have the right to treat my medical condition under this policy?"; and "Will there be a written addendum to the policy that specifically states what my rights are to treat my medical condition, and what is the date that the statement will be complete and added to my personnel file?" (Opp. S.M.F. ¶ 31.)[3] After the meeting on November 21, 2014, Ms. Shippee asked Mr. Wayne to provide Ms. Hudson with the ADA paperwork so that the Commission could obtain information from her healthcare provider in order to determine whether Ms. Hudson was a qualified individual with a disability for purposes of accommodation. (Supp.'g S.M.F. ¶ 34.) Ms. Hudson agrees with the Commission that Mr. Wayne did provide her with the paperwork, but contends that

---

[3] Ms. Hudson has attached the list of questions to her response to the Motion for Summary Judgment as Exhibit 5. Arguably, the list of questions does not comply with M.R.Civ.P. 56(h)(4) or the Maine Rules of Evidence as they do not appear to have been sworn to or authenticated in any way. The questions were referred to in Ms. Hudson's sworn Declaration. *See* ¶ 28.

4

it was not provided until December 10, 2014, after Ms. Hudson had changed all of her treatment products and was following the Policy.[4] (Opp. S.M.F. ¶ 34.)

On November 25, 2014, Ms. Hudson provided a copy of a letter from her general physician stating that she needed lotions to treat her skin condition to Ms. Beaudoin, Mr. Lavin, and Mr. Wayne by email. (Supp.'g S.M.F. ¶ 36). The letter did not specify Ms. Hudson's skin condition. (Supp.'g S.M.F. ¶ 37.) Mr. Lavin looked into whether there may be a problem with the air exchange in the building and whether there were alternative measures that could minimize the effects of scented products in the office, such as air purifiers. (Supp.'g S.M.F. ¶¶ 38, 39.) On December 8, 2014, Mr. Wayne and Mr. Lavin met with Ms. Hudson to inquire about her progress in seeking unscented products. (Supp.'g S.M.F. ¶ 41.) In that meeting, the Commission contends that Ms. Hudson said that she was still looking for the right products. (Supp.'g S.M.F. ¶ 42.) Ms. Hudson alleges that she told Mr. Lavin and Mr. Wayne that she had found two replacement products which were marked unscented or fragrance-free and expected the last product she needed to arrive either that day or on December 9, 2014. (Opp. S.M.F. ¶ 42.)

At the meeting, Mr. Lavin and Mr. Wayne suggested three temporary measures for the office while Ms. Hudson investigated unscented products, all of which had been suggested by Ms. Shippee. (Supp.'g S.M.F. ¶¶ 42, 43.) The three measures were that Ms. Hudson would keep her door closed; that Ms. Hudson would use an alternative door, less than 20 feet from the regular door, to enter and exit the office; and that Ms. Hudson would use a separate conference room, adjacent to the regular conference room, to meet with candidates when necessary. (Supp.'g S.M.F. ¶¶ 44-46.) When Mr. Wayne and Mr. Lavin proposed these changes, Ms. Hudson did not

---

[4] The forms included: a form titled "Request for Accommodation(s)"; a medical release form, and a healthcare questionnaire for her physician to complete.

object. (Supp.'g S.M.F. ¶ 47.) Ms. Hudson alleges that she asked Mr. Wayne to send an email telling her coworkers why her door was shut. (Opp. S.M.F. ¶ 47.) Later that day, by email, Ms. Hudson suggested that when she had questions for the Commissions managers she would call them or email them rather than walking to the front of the office near the workspace of Ms. Phillips. (Supp.'g S.M.F. ¶ 48.)

On December 9, 2014, Mr. Wayne and Mr. Lavin conducted an annual review of Ms. Hudson's work performance for the year ending December 8, 2014. They rated Ms. Hudson's performance as meeting or exceeding expectations in all categories, and discussed projects that they wanted to assign to her over the next year. (Supp.'g S.M.F. ¶ 49.) The Policy was not discussed. (Supp.'g S.M.F. ¶50.)

On December 15, 2014, the Commission reports that Ms. Phillips became ill from a strong fragrance in the office and had to leave work early. (Supp.'g S.M.F. ¶ 51.) The Commission alleges that two other employees, Mr. Lavin and Emma Burke, both noticed and reported that Ms. Hudson was using strongly scented products. Ms. Hudson disagrees that Ms. Phillips became ill and needed to leave work because of a scent. Ms. Hudson contends that there is no evidence, other than Mr. Wayne's assertion, that Ms. Phillips was sick due to a scent and that Ms. Phillips did not display any signs of illness at the time. (Opp. S.M.F. ¶ 51.) Ms. Hudson contends that Mr. Wayne is not qualified to give an opinion on whether or why another is ill. (Opp. S.M.F. ¶ 51.) Additionally, Ms. Hudson alleges that she was wearing the same products on December 15, 2014 as she was on days that Mr. Lavin noted "no" on a "Notable Use of Scented Products" chart that he kept. (Opp. S.M.F. ¶ 52.) At the end of the day, Mr. Lavin and Mr. Wayne went to Ms. Hudson's office to discuss the issue. (Supp.'g S.M.F. ¶ 53.) When they communicated their concerns, Ms. Hudson became upset. (Supp.'g S.M.F. ¶ 54.) Ms. Hudson contends that Mr. Lavin was visibly agitated and the way that they stood in front of her desk felt threatening.

(Opp. S.M.F. ¶ 53.) During the meeting, Ms. Hudson told Mr. Lavin and Mr. Wayne that she had the skin condition eczema. (Supp.'g S.M.F. ¶ 55.)

On December 16, 2014, on the advice of Ms. Beaudoin and Ms. Shippee, Mr. Wayne and Mr. Lavin suggested that Ms. Hudson temporarily work from home until they could come up with a more permanent solution. (Supp.'g S.M.F. ¶¶ 56, 57.) Later that day, Patricia Beaudoin and Mr. Lavin began searching for a workspace within a state office building in case Ms. Hudson needed to continue working off site while she investigated unscented products for her skin condition or sought accommodation under the ADA. (Supp.'g S.M.F. ¶ 66.)

Either the night of December 16, 2014 or early on December 17, 2014, Ms. Hudson removed all of her personal belongings from her office, including an area rug, a coffee table, artwork, decorative objects and plants. (Supp.'g S.M.F. ¶ 67.) Ms. Hudson worked from home December 17th, 18th and the morning of the 19th performing the same work she would have performed in the office. (Supp.'g S.M.F. ¶¶ 62, 64.) On December 18, Ms. Hudson told Ms. Beaudoin that her doctor had placed her on medical leave from December 19 through January 4. On December 19, Ms. Hudson told Ms. Shippee that she had left the ADA forms with her doctor and that he said he would fill them out after January 4, 2015. (Supp.'g S.M.F. ¶ 70.) In anticipation of Ms. Hudson's return, Mr. Lavin secured and set up office space for Ms. Hudson at the Public Utilities Commission to enable her to work comfortably for two or three weeks as they continued to work towards a long-term plan. (Supp.'g S.M.F. ¶¶ 71-76.)

On January 12, 2015, Ms. Hudson told the Commission that her doctor, Dr. Gasper, had extended her medical leave through January 19. (Supp.'g S.M.F. ¶ 79.) On January 12, 2015, Ms. Hudson submitted a letter of resignation to the Commission effective January 20, 2015. (Supp.'g S.M.F. ¶ 80.) On January 16, 2015, Mr. Wayne sent Ms. Hudon a letter asking her to reconsider her resignation

7

and instead to continue the interactive process and return to work. (Supp.'g S.M.F. ¶ 81.) Ms. Hudson replied by email that she would not reconsider. (Supp.'g S.M.F. ¶ 82.) Ms. Hudson never followed up on the ADA forms she left with Dr. Gasper and she never returned ADA forms to the Commission. (Supp.'g S.M.F. ¶¶ 91, 92.)

Plaintiff filed a complaint on February 21, 2017 alleging disability discrimination. On June 1, 2017, Plaintiff filed an amended complaint requesting that the Court: declare that the Commission violated Ms. Hudson's civil right to be free of disability discrimination; reinstate her without work restrictions; provide reasonable accommodations for her disabilities; provide Commission employees with information on the judgment of this case and disability discrimination policies by posting it within the office, sending a letter, and providing mandatory training; award Plaintiff backpay and benefits, compensatory damages, and costs and fees of litigation. Ms. Hudson is no longer asking to be reinstated to her former position with the Commission or for a reasonable accommodation. (Supp.'g S.M.F. ¶ 99.)

I.    Standard of Review

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821. "A material fact is one that can affect the outcome of the case. A genuine issue of material fact exists when the fact finder must choose between competing versions of the truth." *Id.* (citations omitted). When deciding a motion for summary judgment, the court reviews the evidence in the light most favorable to the non-moving party. *Id.*

II.   Discussion

Plaintiff has set out claims for disability discrimination, failure to accommodate, and reasonable accommodation pursuant to the Maine Human Rights Act and the

8

Americans with Disabilities Act (ADA). She has also asserted a claim under the Rehabilitation Act of 1973.

### a. Discrimination

In cases of employment discrimination, the Court applies a three-step, burden shifting analysis. "[A]n employee must first establish a prima facie case that (1) [she] has a disability; (2) [she] is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of [her] job; and (3) [her] employer adversely treated [her] based in whole or in part on [her] disability." *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 14, 45 A.3d 722. If the employee is able to provide prima facie evidence of these three elements, the burden then shifts to the employer to provide evidence of a non-discriminatory basis for the adverse employment action. *Id.* at ¶ 15. If the employer is able to provide such evidence, "the burden shifts back to the employee to produce evidence that the employer's proffered reason is a pretext to conceal an unlawful reason for the adverse employment action." *Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16, 168 A.3d 768 (citation omitted).

### i. Disability

The Commission argues that Ms. Hudson has not set out a claim for disability discrimination because Ms. Hudson cannot show that she is a qualified individual with a disability according to the Maine Human Rights Act. In order to be a qualified individual with a disability pursuant to statute, a person must show that she is "an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires." 5 M.R.S. § 4553(8-D). A disability, as defined by statute, is: "A physical or mental impairment that: 1) Substantially limits one or more of a person's major life activities; 2) Significantly impairs physical or mental health;

9

or 3) Requires special education, vocational rehabilitation or related services." 5 M.R.S. § 4553-A.

In this case, Ms. Hudson alleges that she has a disability that arises from her skin condition. The Commission contends that Ms. Hudson's skin condition may not be considered a disability for purposes of the Maine Human Rights Act. The Court cannot, as a matter of law, find that a skin condition is not a disability for purposes of the Maine Human Rights Act. Therefore, whether Ms. Hudson has a disability and is a qualified person with a disability pursuant to statute is a question of fact. The Court denies the Commission's request to find that as a matter of law Ms. Hudson was not a qualified individual with a disability as of January 2015.

### ii. Otherwise Qualified

In order to maintain a claim for disability discrimination, the plaintiff must show that she is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of her job. The Commission stipulates that Ms. Hudson was otherwise qualified to perform the essential functions of her job, with or without accommodation.

### iii. Adverse Employment Action

The Commission disputes whether there was any adverse treatment based upon Ms. Hudson's alleged disability. In this case, Ms. Hudson left her job at the Commission voluntarily. She was not fired. She claims that she was constructively discharged. In order to satisfy the element of adverse treatment through a showing of constructive discharge, an individual must show that the actions of her supervisors made her work conditions so unpleasant that a reasonable person in her position would have been compelled to quit. *Sullivan v. St. Joseph's Rehab. & Residence*, 2016 ME 107, ¶ 15, 143 A.3d 1283. The Law Court has divided constructive discharge into two elements: "(1) the employer engaged in unlawful retaliatory conduct that created working conditions so difficult or unpleasant that a reasonable

10

person in the employee's shoes would have felt compelled to resign, and (2) that the unlawful retaliatory conduct in fact caused the employee's resignation." *Id.* at ¶ 17. This has been recognized as a heavy burden for a plaintiff to prove. *Rother v. NYS DOCCS,* 970 F. Supp. 2d 78, 93 (N.D.N.Y. 2013) ("the standard for constructive discharge is even higher than that required to prevail on a hostile work environment claim.") "In order for a resignation to constitute a constructive discharge, it must be 'void of choice or free will—[the] only option was to quit.'" *Sullivan,* 2016 ME 107, ¶ 21; *citing EEOC v. Kohl's Dep't Stores, Inc.,* 774 F.3d 127, 134 (1st Cir. 2014).

In *Sullivan v. St. Joseph's Rehabilitation and Residence,* the plaintiff, as director of nursing, was asked to cut staff in order to reduce expenses. *Id.* at ¶ 3. The plaintiff complained that doing so would be harmful to the health of the patients and sent an email to the same effect to the Board of Directors. *Id.* She later complained about the admittance of patients who had needs she believed that St. Joseph's was not able to meet. *Id.* at ¶ 4. In discussions concerning changes to be made to make St. Joseph's more profitable, the plaintiff felt that she was being dismissed and reported that the admissions director and administrator were critical and harsh about her ideas in a rude manner. *Id.* at ¶ 6. She was excluded from meetings and then accused of "not being on board" with the changes. *Id.* at ¶ 7. The plaintiff was presented with a thirty-day performance plan informing her that her employment could be terminated if she failed to improve in certain areas. *Id.* at ¶ 9. The plaintiff resigned on the first day that the performance plan was in place. *Id.* at ¶ 10.

The Law Court found that the plaintiff in *Sullivan* was not constructively discharged from her employment at St. Joseph's. *Id.* at ¶ 22. The Court noted that there was no evidence presented that the criticism, alienation, and thirty-day performance plan were a result of her complaints about patient safety. *Id.* The Law Court found that while the plaintiff alleged facts sufficient to show that she had a difficult work environment, it was not so difficult that her only option was to quit.

11

*Id.* The Court affirmed the grant of summary judgment to St. Joseph's by the Superior Court. *Id.*

As in *Sullivan*, in this case Ms. Hudson has shown that she had a difficult work environment. She has not shown, however, that her only option was to quit. Ms. Hudson could have chosen to stay, to work remotely as had been arranged, and to continue the dialogue on a possible accommodation of her medical needs. The Court finds that Ms. Hudson was not constructively discharged from her employment with the Commission. Therefore, the Court grants the Commission's Motion for Summary Judgment with respect to Ms. Hudson's claim of employment disability discrimination.

b. Failure to Accommodate

The Commission moves the Court to dismiss Ms. Hudson's claim of failure to accommodate her disability. To state a claim for disability discrimination based upon a failure to accommodate, a plaintiff must show that: 1) she is a person with a disability pursuant to statute; 2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer knew of her disability but did not reasonably accommodate it upon plaintiff's request. *See Maloney v. Maine General*, 2014 Me. Super. LEXIS 25, *9; 190 F. Supp. 3d 193, 210 (D. Me. 2016). The law does not "affirmatively and independently establish a duty on an employer to identify reasonable accommodations for a disabled employee." *Carnicella*, 2017 ME 161, ¶ 24. Furthermore, where an employer "demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide that individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business" compensatory and punitive damages are not available. 5 M.R.S. § 4613(2)(B)(8)(b).

12

The Court finds that Ms. Hudson resigned before the Commission was given the opportunity to reasonably accommodate any disability Ms. Hudson may have had. Therefore, even if the Court were to find that Ms. Hudson requested accommodation, the Court would be compelled to find that Ms. Hudson cannot show the elements of a claim for disability discrimination failure to accommodate. Therefore, the Court grants the Commission's Motion for Summary Judgment as to Ms. Hudson's claim for disability discrimination failure to accommodate.

c. Retaliation

In order to establish a prima facie claim of retaliation, plaintiff must show: (1) that she engaged in statutorily protected activity; (2) her employer made an employment decision that adversely affected her; and (3) that "there was a causal link between the protected activity and the adverse employment action." *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (Me. 1991). As with Plaintiff's claim for employment disability discrimination, Plaintiff cannot show that she was constructively discharged. Therefore, Ms. Hudson cannot make a showing of adverse employment action. The Commission is entitled to judgment as a matter of law on Ms. Hudson's claim for retaliation brought pursuant to the Maine Human Rights Act.[5]

III. Conclusion

The entry is:

Defendant's Motion for Summary Judgment is GRANTED.

---

[5] It is unclear to the court whether Ms. Hudson continues to press her claim under Section 504 of the Rehabilitation Act of 1973, since she did not argue it in her opposition to the summary judgment motion. In any event, the Rehabilitation Act of 1973 prohibits discrimination on the basis of a handicap in connection with programs or activities that receive federal financial assistance. It is undisputed that the Commission receives no federal funds. Accordingly, the Commission is entitled to judgment as a matter of law on this claim as well.

The Clerk is directed to incorporate this Order into the docket by reference in accordance with M.R. Civ. P. 79(a).

DATE: October 23, 2018

William R. Stokes
Justice, Superior Court